UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

LIBERTARIAN PARTY OF NEW YORK,
ANTHONY D'ORAZIO,
LARRY SHARPE,
GREEN PARTY OF NEW YORK,
GLORIA MATTERA,
PETER LaVENIA,

     *Plaintiffs*,

        v.

**COMPLAINT**

NEW YORK STATE BOARD OF ELECTIONS,
PETER S. KOSINSKI, as the Co-Chair of the New York State
Board of Elections; DOUGLAS A. KELLNER, as the Co-Chair of
the New York State Board of Elections; ANDREW J. SPANO, as a
Commissioner of the New York State Board of Elections;
TODD D. VALENTINE, as Co-Executive Director of the New York
State Board of Elections; and ROBERT A. BREHM, as Co-Executive
Director of the New York State Board of Elections,

     *Defendants*.

_____

## COMPLAINT FOR DECLARATORY AND PERMANENT INJUNCTIVE RELIEF

### INTRODUCTION

1.     After first failing to circumvent the New York State legislature, Governor Andrew

Cuomo has managed to ram through patently unconstitutional new voter and petitioning

thresholds to keep minor parties off the ballot in New York State and satisfy a personal vendetta.

What is even more galling is that he did so not only by conditioning a new campaign finance

regime on the thresholds, but also by adding the new thresholds—at the last minute—into the

New York State FY2020 budget, which was passed in the midst of an unprecedented emergency necessitating a swift response to the COVID-19 pandemic and depriving individual legislators of effectively organizing any resistance or scrutinizing the inclusion.

2.      Since 1936, a political party could qualify for automatic ballot access in New York State solely by polling 50,000 votes for governor every four years.  To run a candidate for governor without preexisting automatic ballot access, parties provided an independent petition with 15,000 voter signatures collected over six weeks.  The new law requires for political parties 130,000 votes or 2% of the vote (whichever is greater) for governor and president every two years, and for statewide petition 45,000 signatures or 1% of enrolled voters (whichever is less) over the same thirty-seven days.  Not only are these new thresholds difficult or impossible for Plaintiffs to meet, but they were designed to do so.  The nefarious interplay between these two new thresholds deprives minor parties of attaining ballot status and ensures that they will not be able to field statewide candidates to ever again attempt to regain automatic ballot status.  In short, the new law makes New York State one of the most restrictive states in the country for third parties to run statewide or presidential candidates or to win ballot status as political parties.

3.      To correct such a patently disgraceful and improper attempt to limit citizens' First and Fourteenth Amendment rights to organize, identify, and vote for minor parties, New York State's Green and Libertarian Parties come before this Court to request a declaration that the new voter and petitioning requirements are unconstitutional facially and as applied to them, and for this Court to permanently enjoin the New York State Board of Elections from enforcing them.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this case pursuant to 42 U.S.C.

§ 1983 and 28 U.S.C. § 1331, because Plaintiffs' federal claims arise under the First and

Fourteenth Amendments to the United States Constitution.  This Court has supplemental

jurisdiction pursuant to 28 U.S.C. § 1367 over the Plaintiffs' state-based claims because they are

so related to Plaintiffs' federal claims that they form part of the same case or controversy under

Article III of the United States Constitution.

5.      This Court has personal jurisdiction over the Defendants because they are

officials of the State of New York, residing in the State of New York.

6.      Venue is proper in this Court because all Plaintiffs are residents of the State of

New York and the Defendants are state officials who maintain an office in Albany, New York.

*See* 28 U.S.C. § 1391(b)(1).

## PARTIES

7.      Plaintiff Libertarian Party of New York ("LPNY") is the New York State affiliate

of the national Libertarian Party, which is the third-largest political party in the United States and

in 2016 fielded a candidate for president on the ballot in all fifty states and the District of

Columbia.  LPNY was formed in 2018 after receiving 95,033 votes for governor and thereby

qualifying as a political party meriting automatic ballot status under New York Election Law by

exceeding 50,000 votes.  From 1972 through 2018, the Libertarian Party operated as an

independent nominating committee under New York Election Law § 1-104(12) and petitioned for

its candidates to appear on the ballot.  The Libertarian Party has run candidates for statewide or

presidential office every two years since 1974 (except for 1986).  LPNY is committed to

America's heritage of freedom: individual liberty and personal responsibility, a free-market

economy of abundance and prosperity, a foreign policy of non-intervention, peace, and free trade.

8.     ANTHONY D'ORAZIO is the Chair of the New York State Libertarian Party and a registered Libertarian Party voter, residing in Monroe County.

9.     LARRY SHARPE was the Libertarian Party candidate for Governor in 2018 and expended great time, money and energy obtaining ballot status for the Party for presumably four years.

10.     He resides in Queens County and is a registered Libertarian.

11.     Plaintiff Green Party of New York ("GPNY") was formed in 1992 and is affiliated with the Green Party of the United States, which is the fourth-largest political party in the United States and in 2016 fielded a candidate for president in forty-four states and the District of Columbia.  GPNY achieved ballot status in 1998 when its candidate for governor received 52,533 votes.  GPNY lost ballot status in 2002 when it failed to meet the voter threshold.  From 2010 through the present, however, GPNY has qualified for ballot status by receiving for governor 59,906 votes in 2010, 184,419 votes in 2014, and 103,946 votes in 2018.  GPNY's "four pillars" are peace, ecology, social justice, and democracy.

12.     GLORIA MATTERA is co-chair of the New York State Green Party.  She is a registered member of the Green Party and resides in Kings County.

13.     PETER LaVENIA is co-chair of the New York State Green Party.  He is a registered member of the Green Party and resides in Albany County.

14.     The NEW YORK STATE BOARD OF ELECTIONS has offices in Albany, New York.  The New York State Board of Elections is an agency within the Executive Department of the State and is responsible for administering and enforcing all laws relating to elections in New York State.

15.     Defendant Peter S. Kosinski is a Co-Chair of the New York State Board of Elections.  He is sued in his official capacity.

16.     Defendant Douglas A. Kellner is a Co-Chair of the New York State Board of Elections.  He is sued in his official capacity.

17.     Defendant Andrew J. Spano is a Commissioner of the New York State Board of Elections.  He is sued in his official capacity.

18.     The position of the fourth Commissioner of the New York State Board of Elections is currently vacant.  Plaintiffs anticipate amending their complaint to name the fourth Commissioner if one is appointed and anticipate suing that person in his or her official capacity.

19.     Defendant Todd D. Valentine is a Co-Executive Director of the New York State Board of Elections.  He is sued in his official capacity.

20.     Defendant Robert A. Brehm is a Co-Executive Director of the New York State Board of Elections.  He is sued in his official capacity.

21.     At all times herein, the defendants were acting under color of state law and within the scope of their employment.

## FACTUAL ALLEGATIONS

### I.     Overview of New York Ballot Access and Political Party Regulation

22.     Under New York Election Law, there are only two routes through which candidates may run for public office: (1) they can run as candidates of a statutorily recognized political "party" (*see* N.Y. Elec. Law §§ 6–102–36); or (2) they can run as independent candidates nominated by an "independent body" (*see id.* §§ 6–138–142).

23.     Political parties, informally defined, must therefore operate in one of two statutorily recognized ways: (1) as a recognized political "party" (*see* N.Y. Elec. Law § 1–

104(3)); or (2) as an "independent body" that privately nominates, coordinates, and/or organizes independent candidates (*see id.* § 1–104(12)).

24.     A "party" (hereafter, "Statutory Party") was, until April 3, 2020, defined as "any political organization which at the last preceding election for governor polled at least fifty thousand votes for its candidate for governor."  N.Y. Elec. Law § 1–104(3) (2019).

25.     As the Second Circuit explained in *Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411, 415 (2d Cir. 2004), "a number of unique benefits accrue to a" Statutory Party.  First and most importantly, "only a Statutory Party can automatically place a candidate on the ballot for statewide election without first undertaking the burden of a special petition drive in order to do so."  *Id.  See* N.Y. Elec. Law §§ 6–104, 6–138(1).  Second, a Statutory Party may choose their statewide candidate in a closed primary election, while an independent organization may not.  *Id.* § 1–104(9).  Third, the State will expressly identify a Statutory Party on voter registration forms to facilitate enrollment in the party.  *See id.* §§ 5–210(5)(ix); 300, *et seq.*; Voter Registration Form, New York State Board of Elections, https://www.elections.ny.gov/NYSBOE/download/voting/voteform_enterable.pdf (last accessed April 15, 2020).  Fourth, the State tracks and publishes voter enrollment information separately for each Statutory Party.  *See id.* § 5–302(4)–(5).  And Fifth, Statutory Parties' candidates will receive priority in appearing on the ballot before independently nominated candidates.  *See id.* § 7–116(1)–(2).

26.     If a political party cannot qualify as a Statutory Party, it may only operate as an "Independent Body" to privately nominate candidates for the general election ballot and have them attain ballot access through petitioning, as any independent candidate would.  N.Y. Elec. Law § 1–104(12).  The only benefit for political parties operating as Independent Bodies is that their candidates must indicate the political party by name and emblem on the nominating petition

and on the ballot. *Id.* § 6–138(3). Awkwardly, truly independent candidates must also indicate a party name and emblem of some sort. *Id.*

27.     In order to successfully petition for an independent nomination for statewide office such as governor, prior to April 3, 2020, a petition must have been signed within six weeks "by at least fifteen thousand voters, of whom at least one hundred shall reside in each of one-half of the congressional districts of the State." N.Y. Elec. Law §§ 6–138(4); 142(1).

28.     When an Independent Body surpasses the voter threshold to become a Statutory Party, it must then organize and file rules, and may directly nominate candidates before its first primary. N.Y. Elec. Law §§ 2–102–114; 6–128. The rules certified by a majority of the Independent Body's statewide candidates when it became a Statutory Party are deemed controlling in case of conflict. *Id.* § 6–128(4).

## II.     Background for Governor Cuomo's Vendetta Against Minor Parties

29.     Upon information and belief, Governor Cuomo has harbored a personal vendetta against minor parties in New York State.

30.     Governor Cuomo's first notable encounter with third party politics was with his aborted gubernatorial run in 2002. He had run for the Democratic nomination as an outsider candidate, but was successfully pressured by the Democratic establishment to bow out of the race only a week before the election—what the New York Times called "a spectacular humiliation." *See* Shaila K. Dewan, "The 2002 Campaign: The Announcement; Cuomo Quits Race and Backs McCall for Governorship," NY Times, Sec. A, p. 1 (Sept. 4, 2002), *available at* https://www.nytimes.com/2002/09/04/nyregion/2002-campaign-announcement-cuomo-quits-race-backs-mccall-for-governorship.html. To put salt in the wound, Governor Cuomo had already won the nomination of the Liberal Party—and without his knowledge or permission, the Liberal Party decided to continue his campaign in a doomed attempt to meet the 50,000-vote

threshold and retain its line.  *See* Randal C. Archibold, "Cuomo Will Remain on Ballot as Liberal Party Candidate," NY Times, Sec. B, p.4 (Sept. 24, 2002), *available at* https://www.nytimes.com/2002/09/24/nyregion/cuomo-will-remain-on-ballot-as-liberal-party-candidate.html.

31.     In his successful gubernatorial elections of 2010, 2014, and 2018, Governor Cuomo received the candidacy of the New York Working Families Party ("NYWFP") alongside the Democratic Party, but not without conflict or enmity.

32.     In 2010, Governor Cuomo accepted NYWFP's endorsement only after it acceded to his ultimatum to accept his platform of cutting spending, particularly to the unions backing the party.  He threatened the party with otherwise losing ballot access, since there was no other Democratic primary challenger.  *See* "Cuomo Accepts Working Families Party Endorsement," Associated Press (Sept. 12, 2010), *available at* https://newyork.cbslocal.com/2010/09/12/cuomo-accepts-working-families-party-endoresment/.

33.     In 2014, many among the NYWFP membership considered endorsing Zephyr Teachout in her challenge to Governor Cuomo in the Democratic primary.  *See* Chris Smith, "How Cuomo Played the Working Families Party," Intelligencer (Nov. 5, 2014), https://nymag.com/intelligencer/2014/11/how-cuomo-played-the-working-families-party.html#. Nevertheless, NYWFP struck a deal to endorse Governor Cuomo in exchange for him supporting its effort to win a Democratic majority in the state Senate.  *Id*.  Despite the deal, Governor Cuomo provided lackluster support for the effort and indeed formed a new "Women's Equality Party" that was overtly intended to cause confusion for the NYWFP on the ballot, having a similar name and initials.  *Id.*; Jillian Jorgensen, "Zephyr Teachout's Campaign Manager Backs Cuomo on WFP Line," Observer (Oct. 30, 2014), https://observer.com/2014/10/zephyr-teachouts-campaign-manager-backs-cuomo-on-wfp-line/.

34.     In 2018, NYWFP endorsed Cynthia Nixon in her unsuccessful Democratic primary challenge to Governor Cuomo.  Governor Cuomo himself withdrew from the primary after it became clear he would lose.  Three weeks after the primary, NYWFP offered the nomination to Governor Cuomo to retain ballot access and he accepted, seemingly "ending the feud."  Yancey Roy, "Gov. Andrew Cuomo accepts Working Families Party line on ballot, ends feud," Newsday (Oct. 5, 2018), https://www.newsday.com/long-island/politics/spin-cycle/cuomo-nixon-molinaro-1.21518093.  However, several sources reported that Governor Cuomo intended to "destroy the party."  Bill Mahoney, "Cuomo Quietly Presses to Weaken His Working Families Party Nemesis," Politico (Oct. 25, 2019, 5:00 AM), https://www.politico.com/states/new-york/albany/story/2019/10/25/cuomo-quietlypresses-to-weaken-his-working-families-party-nemesis-1225974.

35.     Due to these experiences and others, upon information and belief, Governor Cuomo has developed a personal hatred for third parties—a hatred he would pursue through policy in his third term.

36.     On information and belief, Governor Cuomo at all times herein was also motivated by pure political self-interest in driving the Green Party off the ballot because the Green Party directly competes with the Governor for votes yet refuses to cross-endorse him or any other candidate.  The Governor's motivation to increase his vote total by driving the Green Party off the ballot is not a legitimate or rational basis for enacting a statute.

### III.     Governor Cuomo's Thwarted 2019 Attempt to Kill Third Parties

37.     Immediately following the 2018 election where Governor Cuomo won reelection and the Democratic Party won control of both houses in the New York State legislature, limiting third parties was "on the table" for legislation in 2019.  *See* Yancey Roy, "End to NY's oft-

criticized 'fusion voting' could be on the table," Newsday (Nov. 25, 2018),

https://www.newsday.com/news/region-state/new-york-fusion-voting-1.23626129.

38.     In early 2019, the newly Democratically-controlled New York State Legislature

and Governor Andrew Cuomo negotiated to pass a public campaign financing regime for

statewide and state legislative offices.  They could not agree on the details of such a regime

because, upon information and belief, Defendant Heastie raised doubts about having enough

votes in the Assembly to approve the proposal on the table.  *See* Samar Khurshid, "In State

Budget, More on Voting, Little on Ethics, and Half-Baked Campaign Finance Reform," Gotham

Gazette, https://www.gothamgazette.com/state/8414-state-budget-a-mixed-bag-on-election-

ethics-and-campaign-finance-reforms (Apr. 2, 2019).  Instead, the Governor and Legislature

chose to refer the question to an unelected committee.

39.     As would become clear through the work of this committee, upon information and

belief, Governor Cuomo intended to take campaign finance reform as an opportunity to eliminate

NYWFP and third parties in New York State in time for another run for Governor in 2022.

40.     On or about April 1, 2019, Part XXX of the Laws of 2019 ("2019 Statute"),

Chapter 59, Bill No. S01509C, was enacted by the New York State Legislature with approval of

the Governor as part of the budget for FY 2019.

41.     The 2019 Statute created a Public Campaign Financing and Elections

Commission (the "Commission") composed of nine members appointed by the Governor and

legislative leaders.

42.     The 2019 Statute instructed the Commission "to examine, evaluate and make

recommendations for new laws with respect to how the State should implement such a system of

voluntary public campaign financing for state legislative and statewide public offices, and what

the parameters of such a program should be." 2019 Statute, § 1(a).  The 2019 Statute identified

specific matters regarding which the Commission was authorized to issue recommendations, including "rules and definitions governing: . . . political party qualifications [and] multiple party candidate nominations and/or designations . . . ." *Id.* § 2(j).

43.     Many, including NYWFP and the Conservative Party of New York ("CPNY"), suspected that the Commission would attempt to eliminate fusion voting specifically, as the 2019 Statute included such a specific grant of authority.  Therefore, NYWFP and CPNY separately filed suit on July 22, 2019 in New York Supreme Court to enjoin the Commission's work, primarily arguing under the New York State Constitution that (1) the 2019 Statute was an unconstitutional delegation of legislative authority; and (2) the New York Court of Appeals has found that fusion voting is guaranteed.  *See* Verified Complaint, *Jastrezemski v. Public Campaign Financing and Elec. Comm'n of the State of New York*, No. E169561/2019 (N.Y. Sup. Ct., Niagara Co. July 22, 2019), ECF No. 2; Verified Complaint, *Hurley v. The Public Campaign Financing and Elec. Comm'n*, No. E169547/2019 (N.Y. Sup. Ct., Niagara Co. July 22, 2019), ECF No. 2.

44.     Perhaps in light of NYWFP and CPNY's constitutional arguments, it appears the Commission changed course late in their work and pivoted from eliminating fusion to raising it as the method to wound or eliminate third parties.  Approximately one month before recommendations were due, the New York Times broke the news that Jay Jacobs, chairman of the Commission and Chairman of the state Democratic Party, proposed to raise the voter threshold for Statutory Parties to 250,000 votes to eliminate "sham" parties who allegedly trade ballot lines for political favors.  Vivian Wang, "Democrats' Secret Plan to Kill Third Parties in New York," NY Times (Oct. 29, 2019), https://www.nytimes.com/2019/10/29/nyregion/election-third-party-ny.html.

45.     The Commission issued its recommendations ("Recommendations") on

December 1, 2019, and by operation of the 2019 Statute and failure of the legislature to modify

or abrogate the recommendations, they had "the full effect of law" on December 22, 2019.  2019

Statute, § 1(a).

46.     As Plaintiffs had feared, the recommendations included the following changes to

party qualifications (Recommendations, p.5):

> *Party thresholds*: The Commission proposes recommendations,
> which have the force of law, setting out new thresholds to become
> a political party in New York State. To become a political party in
> New York State, the political body must now receive at least 2% of
> the total votes cast for governor, or 130,000 votes, whichever is
> greater, in a gubernatorial election year and at least 2% of the total
> votes cast for president, or 130,000 votes, whichever is greater, in
> a presidential election year. Note that these two thresholds work
> independently of one another. Also note that this provision takes
> effect on January 1, 2020, so that all existing parties must requalify
> at the November 2020 elections.

> *Independent nominating petitions*: The Commission proposes
> recommendations, which have the force of law, establishing a new
> signature requirement for Independent Nominating Petitions for
> statewide office of 45,000 signatures or 1% (one percent) of the
> total number of votes, excluding blank and void, cast for the office
> of governor during the last gubernatorial election, whichever is
> less, with at least 500 signatures or 1% of enrolled voters,
> whichever is less, from each of one-half of the congressional
> districts in the state. Note that this provision also takes effect on
> January 1, 2020, so beginning in the November 2020 elections, all
> independent nominating petitions filed for statewide office must
> satisfy these thresholds.[1]

47.     The Recommendations tried to connect the new campaign finance regime to the

increased vote and petition thresholds.  The Recommendations further included a non-

severability clause that would tie the fate of the campaign finance program to the new thresholds.

(Recommendations, p. 15.)  Commissioner John Nonna, however, has stated that it was clear

---

[1] 1% of gubernatorial elections results in 61,045 in 2018.

among the Commission members that the campaign finance regime was being conditioned on

adopting the increased petitioning thresholds.  *See* Karen DeWitt, "Minor political parties

condemn Public Finance commission plan," City Newspaper (Nov. 26, 2019),

https://www.rochestercitynewspaper.com/rochester/public-finance-commission-plan-

condemned-by-states-minor-political-parties/Content?oid=11094634.

48.     On March 12, 2020, New York Supreme Court Justice Ralph A. Boniello, III

found that the 2019 Statute authorizing the Commission was unconstitutional.  *Hurley v. The*

*Public Campaign Financing and Elec. Comm'n*, No. E169547/2019 (N.Y. Sup. Ct., Niagara Co.,

March 12, 2020).  The Court found that "[t]he Legislature established the Commission and

delegated to it the authority to create new law and to repeal existing law which is a function

reserved solely to the Legislature under the [state] Constitution."  *Id.*, at *7.  Because the

Commission was invalid, so too were its Recommendations.  For the moment, the new voter

thresholds were off the table.

## IV.     In a Surprise Move, Governor Cuomo Inserts the New Thresholds into the FY 2021 COVID-19 Crisis Budget

49.     Around this time, New York State was rapidly descending into a historical crisis

as it was the epicenter for the COVID-19 pandemic in the United States.

50.     On March 1, 2020, New York State saw its first confirmed case of COVID-19.

Melanie Grayce, "First Case of Coronavirus Confirmed in New York State," Wall Street Journal

(March 2, 2020), https://www.wsj.com/articles/first-case-of-coronavirus-confirmed-in-new-york-

state-11583111692.

51.     On March 3, 2020, a second case was confirmed in New Rochelle who was the

first case of community spread, meaning he had not visited areas with widespread transmission.

This case resulted in dozens more.  Aria Bendix, "At least 28 coronavirus cases in New York are

linked to one man — a 50-year-old attorney who works near Grand Central Terminal. Here's

what we know," Business Insider (Mar. 6, 2020), https://www.businessinsider.com/new-york-second-coronavirus-case-attorney-law-firm-grand-central-2020-3?r=US&IR=T.

52.     On March 7, 2020, Governor Cuomo declared a state of emergency.

53.     On March 11, Cuomo announced that the City University of New York and State University of New York schools would be closed.

54.     On March 12, 2020, Governor Cuomo announced restrictions on mass gatherings, directing events with more than 500 people to be cancelled or postponed and any gathering with fewer than 500 people to cut capacity by 50 percent.

55.     On March 27, 2020, the United States, with a confirmed 111,980 cases, surpassed Italy and China to become the country with the most coronavirus COVID-19 cases in the world; more than 52,000 of these cases were reported in New York State alone.  Sergio Hernandez, Sean O'Key, Amanda Watts, Byron Manley and Henrik Pettersson, "Tracking Covid-19 cases in the US," CNN (Apr. 17, 2020), https://www.cnn.com/interactive/2020/health/coronavirus-us-maps-and-cases/.  Governor Cuomo announced all schools statewide would remain closed until at least April 15, 2020.  Exec. Order No. 202.11: "Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency," Governor Andrew M. Cuomo (March 27, 2020).

56.     That same day, on March 27, 2020, insiders leaked to the Daily News that Governor Cuomo insisted in last-minute budget negotiations that the Legislature pass the Commission's Recommendations, including the new vote and petitioning thresholds.  *See* Dennis Slattery, "Cuomo floats public financing in N.Y. state budget despite judge scuttling controversial commission," New York Daily News (Mar. 27, 2020), https://www.nydailynews.com/news/politics/ny-cuomo-public-financing-budget-after-judge-blocked-20200327-46cqzvxdufdchmangut6kzcuzq-story.html.

57.     On March 31, 2020, Governor Cuomo's secretary, Melissa Derosa threatened state leaders that if they failed to reach an agreement, "State government will shutdown, including the Department of Health" amidst the COVID-19 pandemic.  Zack Fink, Twitter (Mar. 31, 2020, 4:53 PM), https://twitter.com/ZackFinkNews/status/1245091831848853506.

58.     In New York State, the Governor writes the budget and presents it to the Legislature on February 1 of each year as a series of appropriation bills that he may amend at any time before the Legislature's adjournment (with the Legislature's consent if not within thirty days).  N.Y. Const., Art. VII, §§ 2–3.  On the other hand, the Legislature "may not alter an appropriation bill submitted by the governor except to strike out or reduce items therein." *Id.*, § 4.  The budget is due on April 1.

59.     The substance of the Recommendations was made into statutory form and inserted into the State Senate budget bill numbered S7508B with the amendment of April 1, 2020.  The bill summary states that it "[e]nacts into law major components of legislation necessary to implement the state transportation, economic development and environmental conservation budget for the 2020-2021 state fiscal year," yet wholly unrelated was now Part ZZZ ("Part ZZZ") at the end, which "relates to public financing for state office; establishes the New York state campaign finance fund; establishes the NYS campaign finance fund check-off." Senate Bill S7508B, NY Senate (last visited Apr. 19, 2020), https://www.nysenate.gov/legislation/bills/2019/s7508.

60.     Part ZZZ primarily consists of the campaign finance system conceived of by the Commission by adding a Title II to Article 14 of the New York Election Law.

61.     According to State Senator Michael Gianaris, Part ZZZ was intended to codify the overturned Recommendations by the Commission.  Testimony of Sen. Michael Gianaris, N.Y. Senate, April 1, 2020, available at https://www.youtube.com/watch?v=yuH616a9hXA, at 48:35.

62.     Given only days before the budget was due and at a time when even legislators could not properly communicate or caucus because of social distancing and the general chaos of the COVID-19 pandemic, there was no possibility of any debate on the thresholds, much less opposition.

63.     State Senator Liz Krueger succinctly stated the impossible position that Governor Cuomo forced legislators into who would otherwise oppose the new thresholds:

> I will say for the record, I certainly don't like this campaign finance bill either. I wish it wasn't in there. I believe in public financing of campaigns, but I certainly don't like the idea that we, yet again, are trying to take away third parties' rights to be able to run people and participate in our democracy. So like lots of other people, you don't like everything that's in the bill and you hold your nose on the stuff you don't like because you know you need the stuff that you need that's in there.

Testimony of Sen. Liz Kruger, N.Y. Senate, April 1, 2020, available at

https://www.youtube.com/watch?v=yuH616a9hXA, at 1:03:05.

64.     Senator Krueger later explained who she felt was responsible for insisting on the new thresholds at a time of crisis — namely, Governor Cuomo:

> This budget is a crisis budget. It is not what we expected to be passing when we came to Albany in January, but it is what this moment calls for. The current crisis and its economic impact have resulted in a dramatic increase in the need for services while at the same time cutting state tax revenues and leaving the state with at least a $15 billion deficit to close.
>
> Reaching an agreement on a budget between the Governor, the Assembly, and the Senate in this current reality was a huge challenge, particularly given the significant power imbalance created by our state constitution, which gives the Governor an extraordinary amount of leverage in negotiations. I am disappointed with some of the results, particularly the Governor's attack on third parties . . . .

Liz Krueger, "State Budget Update," New York State Senate Newsroom (Apr. 3, 2020),

https://www.nysenate.gov/newsroom/articles/2020/liz-krueger/state-budget-update.

65.     S7508B was passed by the Senate on the afternoon of April 1, 2020 39 to 22.  The amended bill was then sent to the Assembly as A09508B and debated on April 2, 2020, meaning the budget was already late.

66.     Assemblymember Charles D. Lavine confirmed Part ZZZ was meant to codify the substance of the Commission's Recommendations.  Testimony of Assemblymember Charles D. Lavine, N.Y. Assembly, April 2, 2020, at 9:26.

67.     Assemblymember Edward P. Ra pointed out for posterity that Part ZZZ codifies the work product of a Commission that was led by Jay Jacobs, the chair of the state Democratic Party, and was structured to benefit the party in power that controlled New York State government—including through the ballot thresholds.  Testimony of Assemblymember Edward P. Ra, N.Y. Assembly, April 2, 2020, at 23:30.

68.     Assemblymember Robert C. Carroll emphatically stated:

> The worst parts about this budget are truly repugnant pieces of legislation that would not be good on a normal day, but are truly terrible on a day like today.  Last year the worst thing this legislature did was enact a commission to rewrite our election laws.  And it's déjà vu.  I spoke out on the floor a year ago saying they would do antidemocratic things.  That they would subvert the will of the people of the State of New York.  That they would squash political dissent and diversity and they did just that.  A court, in its great thoughtfulness struck down that commission.  Said it was unconstitutional.  Oh boy do I wish this matter was dead.  But no.  In the dead of night, in the time of crisis, both financially and for the health of the people of the State of New York, we've decided that it's important to squash democratic debate.  We've decided it's so important to destroy third parties.

Testimony of Assemblymember Robert C. Carroll, N.Y. Assembly, April 2, 2020, at 1:49:07.

69.     Assemblymember Harvey Epstein stated:

> I worry that we're being a little tone-deaf in this moment when we are seeing the greatest probably economic collapse of our lives – to be pushing forward a bill on public financing and to me the most difficult part of this is changing the ballot admission for parties.  I deeply believe in democracy and the democratic process.  But I am

> so troubled that we believe that we have to change the threshold
> for parties to be able to get on the ballot.  It will basically destroy
> some of the smaller parties here in New York.  And we had a
> commission.  The commission came out with a report.  The court
> said the commission didn't have the authority.  To think that we
> should do this legislatively now is beyond me.  It is something that
> is deeply troubling and deeply problematic to me and my
> community.

Testimony of Assemblymember Harvey Epstein, N.Y. Assembly, April 2, 2020, at 3:19:00.

70.     Assemblymember Yuh-Line Niou pointed out that the bill was intended to target

NYWFP: "[T]his bill also makes changes to our party nomination system to effectively kill

fusion voting, which is a direct assault on our democratic process.  The language we have in this

bill is meant to exclude and remove parties and organizations who have been fighting for

working families in New York for generations."  Testimony of Assemblymember Yuh-Line

Niou, N.Y. Assembly, April 2, 2020, at 2:59:00.

71.     Upon information and belief, no legislator defended the new thresholds on the

merits during the brief period made available for comments or debate.

72.     The New York State Assembly passed budget bill A09508B, along with Part

ZZZ, on April 2, 2020.  Governor Cuomo signed the bill on April 3, 2020.  The Legislature then

adjourned.

73.     Meanwhile, on April 4, Governor Cuomo likened the rapid spread of COVID-19

cases on Long Island to "a fire spreading."  "'A fire spreading': Hot spots are emerging near

New York City," NY Times (Apr. 4, 2020),

https://www.nytimes.com/2020/04/04/nyregion/coronavirus-new-york-update.html#link-

105310cb.  Two days later he extended the State's stay-at-home order and school closures to

April 29.  Exec. Order No. 202.14: "Continuing Temporary Suspension and Modification of

Laws Relating to the Disaster Emergency," Governor Andrew M. Cuomo (April 7, 2020).

### V.        Background and Operation of the New Thresholds

74.     A detailed analysis of the new thresholds would show that they are intended and tailored to force all current minor parties in New York State (except for CPNY) off the ballot and keep them off.

### a.  Vote Threshold

75.     Unlike other states that provide multiple routes for political parties to access the ballot such as thresholds based on enrollment, vote performance in previous elections, or signatures to petition for party status, New York State has historically only provided one: polling a statutory threshold of votes for governor.

76.     The following table of third-party performance in New York State since 2006 demonstrates the effect of the new threshold if it were applied retroactively.  In green are times when a party performed well enough to meet either the former or new threshold to achieve or retain Statutory Party status.  In red are times when a party failed to meet the former threshold. And in yellow are times when a party would have lost or failed to achieve Statutory Party status under the new threshold, but either achieved or retained Statutory Party status under the former threshold.

| Year | Former Threshold | New Threshold | CPNY | Indep. | NYWFP | GPNY | LPNY | SCC / Reform | Women's Equality | SAM |
|---|---|---|---|---|---|---|---|---|---|---|
| 2006 | 50,000 | 130,000 | 168,654 | 190,661 | 155,184 | 42,166 | 14,736 | | | |
| 2008 | | 152,747 | 170,475 | 163,973 | 159,613 | 12,801 | 19,596 | | | |
| 2010 | 50,000 | 130,000 | 232,215 | 146,576 | 154,835 | 59,906 | 48,359 | | | |
| 2012 | | 141,442 | 262,371 | | 148,119 | 39,982 | 47,256 | | | |
| 2014 | 50,000 | 130,000 | 250,634 | 77,762 | 126,244 | 184,419 | 16,769 | 51,492 | 53,802 | |
| 2016 | | 155,073 | 292,392 | 119,160 | 140,043 | 107,935 | 57,438 | | 36,292 | |
| 2018 | 50,000 | 130,000 | 253,624 | 68,713 | 114,478 | 103,946 | 95,033 | 27,493 | 27,493 | 55,441 |

| | PSL | Sapient | Const. | Rent is Too Damn High | Anti-Prohibition | Freedom | Taxpayers | Populist | Socialist Workers |
|---|---|---|---|---|---|---|---|---|---|
| 2006 | | | | 13,355 | | | | | 5,919 |

19

| 2008 | 1,639 | | | | | | | 41,249 | 3,615 |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | | | | 41,129 | 20,421 | 24,571 | 25,825 | | |
| 2012 | 2,050 | | 6,274 | | | | | | |
| 2014 | | 4,963 | | | | | | | |

77.     As one can see from the chart, since 2014, only CPNY would qualify for Statutory Party status, except for GPNY's extraordinary performance in 2014.  The following is a line chart derived from the above table.  The new threshold is represented by the thin solid red line.  The former threshold is represented by the dashed red line.



78.     The above chart also demonstrates that the former 50,000 vote threshold has been working effectively from many angles and considering the judicially recognized justifications for ballot access thresholds to ensure a "modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception,

and even frustration of the democratic process at the general election." *Jenness v. Fortson*, 403 U.S. 431, 442 (1971).

79.     We have approximately four groups of minor parties that comprise a healthy mix and political process from 2006 to 2018: (1) three parties have had consistent Statutory Party presences: CPNY, NYWFP, and the Independence Party; (2) two parties ran regular campaigns and eventually attained Statutory Party status: GPNY and LPNY; (3) three parties attained Statutory Party status in their debut to varying results; and (4) six parties failed to ever reach Statutory Party status.  This all demonstrates a healthy electoral ecosystem.  *See* Robert Costanza and Michael Mageau, "What is a healthy ecosystem?," Aquatic Ecology 33(1), p.105–115 (March 1999) ("[A] healthy ecosystem is one that is sustainable—that is, it has the ability to maintain its structure (organization) and function (vigor) over time in the face of external stress (resilience).").

80.     Each state or presidential election had six to nine entries on the ballot, reflecting a stable overall structure.  This range of entries provides a consistent and familiar ballot organization for voters.

81.     Of parties that manage to petition onto the ballot, for a few the vote threshold prevents their success and they abandon the cause, while for others, their faithful membership struggles to overcome one threshold for signatures to eventually pick up support and overcome the next threshold for votes.  Meanwhile, two parties faded in support and lost access: The Women's Equality Party and the Reform Party.  These failed or successful attempts at gaining or retaining Statutory Party status show that the system has vigor.

82.     Much has occurred politically since the 2006 election when George Pataki left the Governor's office, yet the ballot shows a healthy mix of familiarity and change.  We have gone from a Republican-held Governorship to a unified state Democratic government and yet the

ballot shows no similar realignment and instead reflects the performance and fortunes of the minor parties themselves.  This shows the system's resilience.

83.     Since there was no crisis or overall pattern in the minor party ecosystem that required attention, there are certain observations one can make as to why the Commission settled on 130,000 votes and 2% (whichever is greater) as the standard.

84.     An observation one can make is that the new threshold is finely calibrated to be just beyond the vote performance of most third-parties for the last three gubernatorial and presidential elections.[2]  The calibration seems particularly targeted at NYWFP, which would be approximately 15,000 votes or fewer under the threshold in 2014, 2016, and 2018.

85.     Another observation is that the immediate application of the new thresholds would provide Governor Cuomo with no third-party involvement during his run for reelection in 2022 (except for CPNY).  This leads to two corollary conclusions.

86.     First, in order to ensure no third-party involvement in 2022 specifically, which is likely to be Governor Cuomo's last term if he is successful in his reelection, he needs the new threshold to apply in 2020, a presidential year.  This may explain why the new threshold depends on both gubernatorial and presidential elections, which is novel for New York State ballot access and is quite rare nationally as well.

87.     Second, if not for the 2% requirement, NYWFP's 140,043 vote performance in the 2016 presidential election, if replicated in 2020, would qualify NYWFP for ballot access in 2022 based on a 130,000-vote threshold alone.  The 2% aspect to the threshold prevents such an eventuality.  On the other hand, a 2% vote threshold alone would not be adequate to eliminate third parties, since gubernatorial elections generally attract fewer voters than for presidential

_____

[2] Except for CPNY and the extraordinary GPNY performance in 2014.

elections, which brings the threshold down to a historically more achievable level.  The hypothetical 2% threshold would have been 88,745 votes in 2006, 93,063 votes in 2010, 76,255 votes in 2014, and 121,948 votes in 2018.  Note further that the 2018 election was a once in a quarter-century outlier in terms of voter turnout so generally a 2% threshold would be substantially lower than 130,000 votes during non-presidential years.  *See* Jorge Fitz-Gibbon and Frank Esposito, "Election 2018: NY voter turnout highest since 1994," Rockland/Westchester Journal News (Nov. 7, 2018),

https://www.lohud.com/story/news/politics/elections/2018/11/07/election-2018-results-new-york-state-voter-turnout-highest-since-1994/1921967002/.  Indeed, 130,000 votes represents approximately 3.4% of the vote in 2014 (subtracting blank, void, and scattering votes).  Only with the novel configuration of 130,000 votes and 2%, whichever is higher, can Governor Cuomo assure himself of eliminating NYWFP and other third parties in gubernatorial election years.

88.    One can lastly speculate as to why 2% was chosen as the percentage aspect of the threshold and not, for example, Jay Jacobs's leaked proposal for a 250,000-vote threshold.  This is likely because certain courts have stated that 2% may be an acceptable threshold for ballot access—if the analysis is improperly summarized and distilled into just a number.  *See, e.g.*, *Libertarian Party of N. Carolina v. State*, 365 N.C. 41, 50, 707 S.E.2d 199, 205 (2011) (finding 2% vote and signature requirements for parties to retain or achieve ballot access to not impose a severe burden to merit strict scrutiny, but only because, in part, minor parties had three and a half years in which to collect signatures and Plaintiff Libertarian Party of North Carolina had developed a history of meeting the vote requirement).

89.    The Commission does offer an extremely strained rationale for how it reached its threshold.  (Recommendations, p. 42.)  It claims that the 50,000-vote threshold enacted in 1935

represents a 1.27% percentage of turnout at the 1934 elections. Then, the Commission decides it is somehow appropriate to apply the increase that this enactment represents over the prior 40,000 vote threshold on top of the overall percentage. This then results in 118,902 votes in 2016.[3] Finally, the Commission attempts to attribute the last 11,098 vote difference to its new 130,000-vote threshold for "future increases to voter turnout that we anticipate in future election cycles," which for the third time discounts the increase the Commission has claimed to have already applied. Moreover, the Commission wholly ignores the effect of the 2% aspect of the new threshold, which automatically increases with voter turnout, overrides the 130,000-vote threshold, and has a significant effect. For example, 2% of 2016 presidential turnout was 156,040 votes, over 26,000 votes above the 130,000 total the Commission tries so hard to reach.

90.   The Commission's pathetic mathematical exercise achieves only one thing: demonstrating that the new threshold is entirely pretextual and was conceived solely to achieve political ends, namely the elimination of minor parties, especially NYWFP.

### b. Petition Threshold

91.   In conjunction with the increased vote threshold for Statutory Party retention, the Commission and Part ZZZ increased the signatures a candidate requires to make the ballot using an independent petition.

92.   Unless a political party is already a Statutory Party, it must use the independent nominating petition procedure to run a candidate for governor or president who can then win or retake Statutory Party status for his or her political party.

---

[3] The Commission claims the 118,902 votes are necessary to "remain equivalent to the percentages applicable in 1934," but that double-counts the 1935 1.27% threshold and the increase from 1934.

93.     Previously, a candidate for state-wide office, including governor, had six weeks to collect an independent nominating petition containing 15,000 valid signatures.  The new threshold raises the number of valid signatures to 45,000 "or one percent of the total number of votes, excluding blank and void ballots, cast for the office of governor at the last gubernatorial election, whichever is less."  (Part ZZZ, § 9.)[4]  It also raises a concurrent requirement to get at least 100 votes from residents of "one-half of the congressional districts of the State" to 500. (*Id*.)

94.     Upon information and belief, New York is one of only eleven states where the only route for a political party to initially attain automatic ballot access is to petition onto the ballot a statewide candidate who must then receive a certain number of votes.  Other states offer routes for access such as a party petition or a threshold for party enrollment.

95.     Furthermore, a successful independent nominating petition will often require the collection of many more signatures than statutorily required, since such petitions are often challenged, and signatures may be voided for many reasons and technical defects.  Indeed, New York State is notorious for its strict technical requirements.  It is therefore accepted wisdom to collect 1.5 or 2 times the required number of signatures—in this case 67,500 to 90,000 (or approximately 2,000 per day).  Due to these high numbers, campaigns and parties will often hire people or firms to collect signatures.

96.     A signature must come from registered voters.  N.Y. Elec. Law § 6-138(1).

97.     A voter must sign the petition the right way, with his or her signature in the signature line, his or her printed name under that, his or her address to the right exactly as the

---

[4] 1% of qualifying votes for governor in 2016 would be 60,974.  Barring major changes in population or turnout, the 45,000 threshold will always be lower moving forward and operate as the only relevant number for analysis.

Board of Elections has it in its files, and the date of signature to the left.  N.Y. Elec. Law §§ 6-130–32.

98.     A voter must not have signed a previous petition for the same position.  N.Y. Elec. Law § 6-138(1).

99.     The voter must sign in the presence of a subscribing witness or notary.  Moreover, a subscribing witness must be enrolled in the same party and be a New York State resident.  N.Y. Elec. Law § 6-140.  *But see Free Libertarian Party, Inc. v. Spano*, 314 F. Supp. 3d 444 (E.D.N.Y. 2018) (holding the subscribing witness residency requirement unconstitutional).[5]

100.     Practically speaking, many voters refuse because they misinterpret a signature as support for the candidate rather than placement on the ballot.  Many also refuse because they react negatively to solicitation or do not want to share their personal information with a canvasser.

101.     As a result of the COVID-19 pandemic, collecting signatures may be much more difficult for an indefinite number of years, since people will be less willing than ever to approach canvassers and share the pen and clipboard needed to sign.

102.     Most notably, the increased signature threshold of 45,000 signatures does not lengthen the period for collection, which remains six weeks.  This means a political party would have to average 1,071.4 signatures per day, and many more to withstand or discourage a challenge.  Upon information and belief, this draconian figure makes New York State a gross outlier among all states in terms of the signatures per day that a political party would have to collect to either submit a party petition or a petition for the candidate through whom it would win

---

[5] This decision was vacated as moot by the Second Circuit because that election cycle had passed.

automatic ballot access.  This herculean task is compounded by the challenge that all minor parties would be competing against each other for voter signatures and paid petitioners.

103.    Due to all the above factors and others, collecting signatures for a successful independent nominating petition is incredibly costly and practically difficult.  Accordingly, petitioning often saps the resources of minor parties in terms of money and volunteers and prevents effective campaigning in the general election.  If a political party loses ballot access, it therefore faces compounding obstacles: it must mount a successful petitioning drive and then it must attain the voter threshold it had previously failed to meet without needing to mount a successful petitioning drive.

104.    For minor parties facing these new increased thresholds, the obstacles are even greater.  If a political party is unable to meet the increased voter threshold in 2020, it will have to mount in 2022 a nearly impossible petitioning drive at a scale it never previously had to meet and then again attempt to meet the increased voter threshold.  These new thresholds therefore function as a one-two punch to eliminate automatic ballot access and then eliminate if not access through petitioning, then the ability to ever mount an effective challenge in the general election to attain automatic ballot access again.

## VI.    The Justifications for the New Thresholds Are Clearly Pretextual

105.    Since the new thresholds were passed at the last minute as part of an overdue and emergency budget bill, there is limited to no legislative history to parse the Legislature and the Governor's claimed intent.  However, as the 2020 Statute merely passed into law the Recommendations word for word, it is reasonable to look to the rationale of the Commission in forming its Recommendations.

106.    The Commission explained its rationale for the vote and petition thresholds on pages 14–15 of the Recommendations, which is quoted here in full:

*Party thresholds*:

(20) Part XXX, §2(j) of Chapter 59 of the Laws of 2019 specifically tasked the Commission with addressing the election law as it pertained to party threshold. The Commission has recommended amendments to Election Law §1-104(3) that raise thresholds for political parties to receive ballot access. The primary motivation for the Commission addressing party ballot access is to craft a public campaign finance system that remains within the enabling statute's limitation of a $100 million annual cost. Since candidates who seek to participate in the proposed public campaign finance system will appear on ballots as associated with a political party and voters often rely on a candidate's association with a political party to inform their choices of candidates, the ability of a party to demonstrate bona fide interest from the electorate is paramount in ensuring the success of a public campaign finance system. The Commission finds that setting a rational threshold for party ballot access, based on a demonstration of credible levels of support from voters in this state, helps to ensure that political parties whose candidates will draw down on public funds under the public matching program reflect the novel and distinct ideological identities of the electorate of New Yorkers who ultimately fund this public campaign finance program.

(21) By raising the party ballot access threshold to 2% of the total votes cast for governor or president, or 130,000 votes, whichever is greater, we have retained a measure of proportionality between the number of voters in New York State and the ability of political parties that assert a bona fide representative status for those voters that has been the longstanding policy of this State for centuries. Additionally, we believe that increasing party threshold will actually increase voter participation and voter choice, since voters will now be less confused by complicated ballots with multiple lines for parties that may not have any unique ideological stances. If ballots are simpler in appearance and the parties listed on those ballots can relate to concrete ideological perspectives that voters can identify with, voters can make more resolute choices between candidates appearing under those party lines and rely upon the knowledge that such parties have sufficient popular support from the electorate of this state.

*Independent nomination petitions*:

(22) As a corollary to raising the threshold for political party ballot access, we have also recommended increasing the signature thresholds for candidates who file independent nominating petitions to 45,000 signatures or 1% (one percent) of the total number of votes, excluding blank and void, cast for the office of governor at the last gubernatorial election, whichever is less, with

at least 500 signatures or 1% of enrolled voters, whichever is less,
from each of one-half of the congressional districts in the state.

107.    The Commission's rationales for the new thresholds can be categorized and
summarized in order as: (1) "primarily" to lower cost to the public campaign finance system;
(2) to have candidates or parties reflect "unique ideological stances"; (3) to make ballots
"simpler in appearance"; (4) to ensure that parties have "concrete ideological positions"; and
(5) to assure voters that parties have "sufficient popular support from the electorate."  As
explained below, each of these justifications is clearly pretextual.

> **a.  The Primary Rationale to Lower Costs to the Public Campaign Finance
> Regime is Nonsensical**

108.    The Commission's "primary" rationale is to lower costs for the public campaign
finance regime.  This is reflected in the Commission and the Legislature's coupling of the new
public campaign finance regime with the new thresholds through their presence in the same bill
or Recommendations and through the non-severability clause.

109.    Governor Cuomo has offered this rationale: "If you have seven political parties in
the state and you go to public financing, which is the goal, you could potentially be financing
1000 candidates per election cycle, right?  Seven parties, couple of hundred candidates statewide.
The public could be financing 1,000 races, which is absolutely politically and economically not
feasible."  Emily Jacobs and Bernadette Hogan, "Warren slams Cuomo ally, state Dems for
efforts to take down third parties," New York Post (Oct. 29, 2019),
https://nypost.com/2019/10/29/warren-slams-cuomo-ally-state-dems-for-efforts-to-take-down-
third-parties/.

110.    However, this supposed justification is not consistent with how the regime
operates or could operate, nor with established jurisprudence.

111.    Firstly, the public campaign finance system will not be funding the vast majority of third-party campaigns.  Part ZZZ has its own thresholds for access to public financing based on the number and amount of matchable contributions the candidate raises, defined generally as between $5 and $250 from a New York resident of the relevant district:

| Office | Dollar Threshold | Number of Contributors |
|---|---|---|
| Governor | $500,000 | 5,000 |
| Lieut. Governor | $100,000 | 1,000 |
| State Senator | $12,000 | 150 |
| Assemblymember | $6,000 | 75 |

Part ZZZ, § 4, §§ 14-200-a(11); 14-203(2).  Some third-party candidates who are fusion candidates with one of the major parties will meet these thresholds, but they will be running regardless and eliminating third parties does not prevent any expenditures.  The only relevant scenario would be if a fusion candidate continues to run an active campaign on the third-party line after losing the major party primary, which almost never happens.  With regard to candidates running only on a third-party line, unfortunately, such candidates almost never raise the amounts to meet these thresholds—and if they were to do so, it would be a feat that itself would demonstrate adequate support and legitimacy to merit ballot access.[6]

---

[6] Commissioner Jay Jacobs attempts to point to the 2019 NYC Public Advocate special election (and the NYC campaign finance regime already in place) to raise alarm about the potential financial toll.  (Recommendations, pp. 55, 63.)  This comparison is more than inappropriate. That election was a one-stage nonpartisan race and overwhelmingly involved contenders for what would otherwise have been a Democratic primary.  Eliminating third parties would not have affected the spending in that election.  The subsequent Public Advocate general election featured only three candidates and the Libertarian, Devin Balkind, did not apply for matching funds or meet the threshold to receive them.  Indeed, no one received matching funds, despite the two major party candidates participating in the program.

112.     Secondly, the State could have easily established a separate threshold for minor party candidates to qualify for campaign finance funds, rather than raise the underlying ballot access thresholds.  For the most obvious comparison, Connecticut's campaign finance "Citizens Election Program" contains separate qualification criteria between major party candidates and minor party candidates (that operate in addition to contribution-based thresholds).  *See* Conn. Gen. Stat. § 9–702(a).  A minor-party candidate can only qualify for grants if his or her party won 10–20% of the vote in the same race in the last election or if he or she submits a petition with a number of signatures equal to 10–20% of the vote in the same race in the last election. *See id.* § 9–705(c)(1)–(2), (g)(1)–(2).  These separate qualification criteria were upheld as constitutional by the Second Circuit in *Green Party of Connecticut v. Garfield*, 616 F.3d 213, 224–39 (2d Cir. 2010).[7]

113.     Thirdly, it is antithetical to our democratic constitutional system and its history to restrict ballot access in order to save funds for a public campaign financing regime.  The Supreme Court has found that ballot access is a "core" feature of our democracy and the Constitution.  *See Williams v. Rhodes*, 393 U.S. 23, 32 (1968) ("Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past.").  State limitations to ballot access date back only to the nationwide adoption of the secret "Australian" ballot in the late 19th century when state governments took over the design

---

[7] The State disadvantaged minor party candidates expressly by barring public funds for candidates running unopposed in a primary election, unless, of course, that candidate belongs to one of the top two parties.  Part ZZZ, § 4, § 14-204(3).  Furthermore, candidates in districts with fewer than one thousand enrolled voters of their party are subject to a $5,000 cap in the primary. *Id.* § 14-204(5).  This provision only effects minor parties.

and administration of the ballot.  *See generally* Eldon Cobb Evans, *A History of the Australian Ballot System in the United States* (1917), available at

https://archive.org/details/ahistoryaustral00evangoog/page/n4/mode/2up.

114.    Public campaign financing, on the other hand, is a far more recent 20th century invention and is brand new for New York State.  While advocates consider public campaign financing to be beneficial and enhancing of democracy by, in their view, reducing the role of money in politics, the establishment of such regimes is merely a "choice within the granted power" of Congress or each State's legislature.  *Buckley v. Valeo*, 424 U.S. 1, 90 (1976). Whatever one's perspective on public campaign financing, unlike fair and open ballot access, one cannot describe it as an imperative or a "core" feature of the electoral process or the First Amendment.  The Supreme Court has accordingly established a clear demarcation between public financing and ballot access, acknowledging that "public financing is generally less restrictive of access to the electoral process than . . . ballot-access regulations" and applying different constitutional analyses to each.  *Id.* at 95.

115.    Contrary to this traditional understanding, the Recommendations consistently assume that the ballot does nothing more than support the public campaign financing regime— that voters do or should care more about who is receiving public campaign financing funds than for whom they intent to vote.  *E.g.*, Recommendations, p.14, ¶ 20 ("The Commission finds that setting a rational threshold for party ballot access . . . helps to ensure that political parties whose candidates will draw down on public funds under the public matching program reflect the novel and distinct ideological identities of the electorate of New Yorkers who ultimately fund this public campaign finance program.").  This is profoundly backwards.  Upon information and belief, no court has ever recognized safeguarding a public campaign finance system to be a legitimate governmental interest for limiting ballot access.

### b.  The New Thresholds Do Not Support Unique Ideological Stances

116.    The Commission's second rationale is for candidates drawing on public funds to "reflect the novel and distinct ideological identities of the electorate of New Yorkers who ultimately fund this public campaign finance program."

117.    Contrary to this stated goal, the new thresholds do nothing but eliminate "novel and distinct ideological identities."  As demonstrated above, even third parties that field candidates running solely on their line will not survive the new thresholds.  Parties such as LPNY and GPNY who represent distinct and unique nationally recognized ideological positions will be highly unlikely to survive the new thresholds and remain or qualify for the ballot.

### c.  New York Ballots Are Not Confusing

118.    The Commission's third rationale is to make the ballot "simpler in appearance" and reduce voter confusion.  It did not expand on any current complexity or confusion other than those concerning ideological stances, addressed separately below.[8]

119.    While the Commission did not provide any justification, there is no indication that New York State voters have been inordinately confused with the number of parties appearing on the ballot in recent years.  There has been a consistent range of parties in each statewide or presidential election with no significant deviation.

120.    Upon information and belief, other states have a similar or greater amount of parties regularly appearing on statewide or presidential ballots.

---

[8] The only mention in public testimony before the Commission regarding a complicated ballot was with regards to fusion voting, which was not, in the end, addressed by the Recommendations.  *See* Recommendations, p. 119 ("Jeremy Zellner, Chair of Erie County Democratic Committee, opposes fusion voting. . . .  He . . . stated that fusion ballots increases [sic] voter confusion with complicated ballots.").  Fusion voting presents unique problems like the same candidate appearing on multiple lines, but the new thresholds do not target such issues.

121.    Without any trigger for concern or adequate showing for why this is an issue, this justification is merely pretextual, as well as arbitrary and capricious.

### d. The Rationale Regarding Confusing Ideological Stances Was Meant to Apply to a Ban on Fusion and is Nonsensical When Applied to Party Threshold

122.    The Commission's fourth rationale for the new party threshold is that it will "increase voter participation and voter choice, since voters will now be less confused by complicated ballots with multiple lines for parties that may not have any unique ideological stances."

123.    This rationale was clearly intended to cover the abandoned plans for a ban on fusion voting, where parties in New York State may cross-endorse candidates running on other lines, most commonly from the two major parties.  By extending or withholding the cross-endorsement, parties primarily engaging in fusion voting can influence major party candidates to adopt positions more aligned with their own.  One might think that voters would be *less* confused by fusion parties because they will always campaign adjacent to a specific major party and become well-known for that association.  However, one could argue that the presence of parties primarily engaging in fusion voting leads to parties on the ballot that are not ideologically "unique."  Accordingly, Commissioner Jacobs and members of the public argued that fusion voting confuses voters ideologically.  *See, e.g.*, Recommendations, pp. 91 ("Commissioner Jacobs inquired about fusion voting impairing voter choice and confusion of voters when a candidate has two mutually exclusive ideologies when endorsed by multiple parties."); 102 ("Lynne Boecher opposes fusion voting because it leads to increased voter confusion."); and 116 ("Casey Marlow stated that fusion voting creates voter confusion and empowers ideologically indistinct parties to create an undue influence on the current election cycle.").

124.    The Commission did not, however, ban fusion voting.  As shown above, the increased voter threshold equally targets for elimination parties with unique ideological stances

and parties primarily engaging in fusion voting.  The new threshold does not increase choice for voters in any way.[9]  This justification must therefore be seen as pretextual, as well as arbitrary and capricious.  Furthermore, as applied to LPNY and GPNY, who primarily run their own unique candidates, it does not at all apply.  Eliminating LPNY and GPNY from the ballot undermines ideological distinctiveness.

125.    Commissioner Jacobs has attempted to offer a related justification:[10] that "fusion voting impair[s] voter choice and confusion of voters when a candidate has two mutually exclusive ideologies when endorsed by multiple parties."  Recommendations, p. 91.  This opinion misperceives how fusion voting works in that parties will often cross-endorse so voters can indicate their desire for the candidate to reprioritize policy in favor of the fusion party's priorities.  Never is the fusion party's ideology "mutually exclusive" from the relevant major party, as that would defeat the purpose of influencing the candidate, since he or she would be unable to so compromise.

### e.  Raising the Threshold is Not Necessary to Assure Voters That Parties Have "Sufficient Popular Support From The Electorate"

126.    The final justification offered by the Commission is that the increased threshold is necessary to assure voters that parties have "sufficient popular support from the electorate."

---

[9] The only conceivable argument for how raising the thresholds could result in only parties with "unique ideological stances" remaining is if the fusion parties were competing with or crowding out the "unique" minor parties, and voters and operators had the wherewithal to coalesce around the "unique" minor parties before all parties lost ballot access and were doomed to the new, impossible independent petitioning threshold.  Simply by stating this, one realizes how unlikely and implausible is such an understanding.  In reality, fusion parties primarily compete with the major parties.  The "unique" parties would not benefit from their elimination.

[10] Commissioner Jacobs has stated his preference for banning fusion voting.  *See* Recommendations, p. 61 ("I believe that there are significant ballot access issues related to fusion voting and agree with many who testified in favor of its elimination.").

While this is a traditional justification recognized by the U.S. Supreme Court, the Commission provides no independent rationale for the benefits of this specific increase.

127.    As shown above, the 50,000 vote threshold based on gubernatorial results has functioned well enough to keep parties off the ballot without sufficient popular support, such as the various one- or two-time runs that could not achieve Statutory Party status or the Women's Equality and Reform Parties that lost their status after failing to maintain popular support.

### f. The Commission and Legislature Failed to Provide Any Justification for Raising the Signature Requirement for Independent Nominating Petitions

128.    The Commission provided no rationale or justification for its increase of the signature requirement for independent nominating petitions.  The only rationale was offered by Jay Jacobs, who claimed that without increasing the signature requirement, non-party status candidates for governor would legally be entitled to participate in matching funds and cost tens of millions.  Recommendations, p. 65.  He also claimed that the increase would put governor in line with other offices.  *Id.*

129.    As discussed above, Mr. Jacobs's claims about cost are grossly exaggerated and faulty on many premises.  As a practical matter, these candidates are not capable of meeting the public financing qualifying thresholds, much less exhausting their matching amounts.

130.    Mr. Jacobs's rationale to match the signature requirement for governor to other offices is also defective.  The reduced comparative number for governor acknowledges the Election Law's privileged treatment of elections for governor for party status qualification.  The requirements for other offices may be unreasonable and unconstitutional themselves if they were treated as entryways to party status.  Moreover, his examples of Congressional, State Senate, and Assembly races already exhibit a lack of minor party participation that should be a cause for concern.  Indeed, many of these races do not involve a candidate from one of the two major parties.

131.    Finally, Mr. Jacobs claims that the 45,000-signature threshold is similar to 24 states when adjusted for population.  Recommendations, p. 65.  This statistic ignores, of course, the length of time other states provide to collect signatures and the availability of other routes to achieve party status.  On both counts, New York is one of the worst.

132.    Without any substantial justification for the increase in the signature threshold for independent nominating petitions, it must be seen as pretextual, discriminatory, arbitrary, and capricious.  Its true purpose is to eliminate minor parties from the ballot, either by discouraging any new efforts or by making it impossible for current statutory parties like LPNY and GPNY to regain access they may have lost due to the increased voter threshold.

## VII.    The New Thresholds Work Together to Be Among the Most Restrictive for Third Parties Nationwide

133.    The Recommendations attempt to argue that the new thresholds are common to those nationwide, but this analysis is both incorrect and misleading.

134.    Ignoring all the alternative routes to ballot access, how often the threshold must be met, and the numerous esoteric aspects especially of signature requirements (such as the length of time to collect them), the Commission concludes that New York's increased voter threshold places it from 30th in terms of least onerous to 38th.  Recommendations, pp. 42–44.  In reality, however, lining each state up simply by the most identifiable absolute number is an artificial exercise that yields little of substance.

135.    The Commission further lists other states that impose a similar or higher vote threshold, a similar or more frequent requalification requirement, or qualification through the presidential vote.  Recommendations, pp. 44–47.  Each of these aspects viewed in isolation may not appear uniquely burdensome, but the totality of the circumstances for political parties undoubtedly makes New York one of the least hospitable states for minor party ballot access.

136.    Upon information and belief, New York is only one of eleven states that provides no route to party status other than through an independent candidate, only one of 21 states to condition status on a vote threshold, and only one of five to require presidential candidates to meet a voter threshold. As the Commission is forced to recognize, New York is also on the extreme side for percentage of the vote alone. Taken together, along with the uniquely onerous signature threshold for independent petitions, New York Election Law clearly imposes a severe burden on third party access to the ballot.

### VIII. The Immediate Application of the New Thresholds Unconstitutionally Burdens Minor Party Access to the Ballot in 2020

137.    Part ZZZ applies the increased voter and petitioning thresholds immediately, including the 2020 presidential election set for a primary election on June 23, 2020 and a general election on November 3, 2020. *See* Part ZZZ, § 12.

138.    This leaves little time for minor parties to adjust or plan for the primary election and the general election to shift from any other priorities, such as favoring a candidate to educate the public or concentrating on congressional or local races, to the existential issue of garnering enough votes for President.

139.    The immediate application has various consequences for minor parties. For example, the Libertarian Party candidate for President in 2016 was Gary Johnson. He was on the ballot line for both the LPNY and the Independence Party. LPNY will now have to lobby this year's Libertarian Party candidate Jo Jorgensen to only accept nomination by LPNY, thus costing the campaign the potential benefit of another ballot line and the Independence Party of a potentially favored candidate.

140.    The biggest consequence, however, is that minor parties could not have drafted and rallied around candidates in anticipation of an existential threat. Parties like GPNY and LPNY have organized for years based on the expectation that state resources need to be hoarded

and concentrated on gubernatorial races in terms of persuasive candidates, funds, and volunteering effort.  They are not prepared to reallocate these resources to this year's presidential campaigns.

141.    Compounding these issues is the COVID-19 pandemic.  With stay at home orders and ongoing social distancing among voters for the foreseeable future, traditional modes of campaigning have been disrupted in whole or in part.  Door-knocking, campaign rallies, and face-to-face politicking are all off the table.  Minor parties have an especially hard task ahead of them to maintain their support at 2016 levels, much less to have a runaway election year to meet the greatly increased voter threshold.

142.    The effect of COVID-19 was completely knowable when Part ZZZ was passed with the COVID-19 emergency budget on or about April 3, 2020.  To change the rules of the game so drastically at such a late stage in such circumstances imposes a severe burden on third-party access to the ballot and is not reasonably tailored to further a compelling or legitimate state interest.

## COUNT I

### (Violation of Plaintiffs' Rights Guaranteed By the First and Fourteenth Amendments)

143.    Plaintiffs reallege each preceding paragraph as if set forth fully herein.

144.    Part ZZZ, Sections 9–10, and 12, facially and as applied separately and in conjunction with one another, impose severe burdens on Plaintiffs' First and Fourteenth Amendment rights, and they are not reasonably tailored to further a compelling or legitimate state interest.

145.    Part ZZZ, Sections 9–10, and 12, facially and as applied separately and in combination, severely burden Plaintiffs' right to speak and associate for political purposes, and

to establish and grow a political party, by making it practically impossible for minor parties, including Plaintiffs LPNY and GPNY, to retain automatic ballot access.

146.    Part ZZZ, Sections 9–10, and 12, facially and as applied separately and in combination, severely burden Plaintiffs' right to speak and associate for political purposes, and to establish and grow a political party, by making it practically impossible for minor parties, including Plaintiffs LPNY and GPNY, to regain automatic ballot access if lost.

147.    Part ZZZ, Sections 9–10, and 12, facially and as applied separately and in combination, severely burden Plaintiffs' right to speak and associate for political purposes, and to establish and grow a political party, by making it practically impossible for minor parties, including Plaintiffs LPNY and GPNY, to retain automatic ballot access in the 2020 presidential election year.

148.    Part ZZZ, Sections 9–10, and 12, facially and as applied separately and in combination, impose unreasonable and discriminatory restrictions upon Plaintiffs' right to speak and associate for political purposes, and to establish and grow a political party, by making it practically impossible for minor parties, including Plaintiffs LPNY and GPNY, to retain automatic ballot access.

149.    Part ZZZ, Sections 9–10, and 12, facially and as applied separately and in combination, impose unreasonable and discriminatory restrictions upon Plaintiffs' right to speak and associate for political purposes, and to establish and grow a political party, by making it practically impossible for minor parties, including Plaintiffs LPNY and GPNY, to regain automatic ballot access if lost.

150.    Part ZZZ, Sections 9–10, and 12, facially and as applied separately and in combination, impose unreasonable and discriminatory restrictions upon Plaintiffs' right to speak and associate for political purposes, and to establish and grow a political party, by making it

practically impossible for minor parties, including Plaintiffs LPNY and GPNY, to retain automatic ballot access in the 2020 presidential election year.

151.    Such burdens cause injury to and violate Plaintiffs' First and Fourteenth Amendment rights.

### COUNT II

**(Violation of Rights Guaranteed By the Equal Protection Clause)**

152.    Plaintiffs reallege each preceding paragraph as if set forth fully herein.

153.    Under New York law, the Democratic and Republican parties remain ballot-qualified in each general election cycle without the need to expend money, resources or effort to meet Part ZZZ, Sections 9–10's voter and petitioning thresholds.

154.    Part ZZZ, Sections 9–10, and 12, facially and as applied separately and in combination, impose unequal burdens on Plaintiffs, in violation of their right to the equal protection of law, by requiring minor parties like LPNY and GPNY to expend substantial funds and resources to become ballot-qualified and remain ballot-qualified in successive election cycles.

155.    Part ZZZ, Sections 9–10, and 12, facially and as applied separately and in combination, impose unequal burdens on Plaintiffs, in violation of their right to the equal protection of law, by requiring minor parties like LPNY and GPNY to meet a dramatically increased voter threshold with only several months' notice.

156.    Part ZZZ, Sections 9–10, and 12, facially and as applied separately and in combination, impose unequal burdens on Plaintiffs, both cause injury to and violate rights guaranteed to Plaintiffs by the Equal Protection Clause of the U.S. Constitution.

## COUNT III

**(Violation of Rights Guaranteed By the Due Process Clause and First Amendment)**

157.    Plaintiffs reallege each preceding paragraph as if set forth fully herein.

158.    The plaintiffs, in 2017-18, in reliance on the then prevailing law governing ballot access, expended tremendous resources in time, money and energy, securing the 50,000 votes required to guarantee ballot access for four years.

159.    The statutory revision could deprive the plaintiffs of this hard-won ballot access and political speech for the years 2021 and 2022 in violation of substantive due process, fundamental fairness and freedom of speech and association.[11]

160.    Part ZZZ, Sections 9–10, and 12, as applied separately and in combination, impose unfair and unexpected burdens on Plaintiffs, both cause injury to and violate rights guaranteed to Plaintiffs by the Due Process Clauses of the U.S. Constitution.

## COUNT IV

**(Violation of Rights Guaranteed By the Due Process Clause and First Amendment)**

161.    Plaintiffs reallege each preceding paragraph as if set forth fully herein.

162.    The various odious factors outlined in the complaint, in combination, have deprived the plaintiffs of their right to due process in the sense of fundamental fairness.

163.    Those factors include:

      a.   The Governor's personal vendetta against third parties which motivation cannot constitute the rational basis for a statute under due process;

---

[11] "The concept of due process evolved in order to protect individuals from the arbitrary and capricious acts of legislative will." J. Hilliard, "To Accomplish Fairness and Justice: Substantive Due Process," 30 *J. Marshall L. Rev.* 95, 100-101 (1996).

b.  The passage of the bill with little notice or opportunity to be heard in the midst of a pandemic;

c.  Smuggling the bill inside a budget bill which made it difficult to separate out or oppose;

d.  Depriving the plaintiffs of a right to free speech they had earned in the political marketplace, without a rational basis or just cause.

e.  Changing the rules of the game in the middle to the prejudice of the plaintiffs who lack the time to adjust to the new rules.

f.  Drastically increasing the difficulty of obtaining ballot status during a pandemic that has essentially shut down retail political activity and restricted political activity to extremely expensive television advertising beyond the means of the plaintiffs as minor parties and activists in those parties; in fact, actually increasing the risk of the spread of disease in the future by tripling signature requirements;

164.    These illicit factors, which in combination, are offensive to decent sensibilities, have deprived the plaintiff of due process, including substantive due process in the sense of fundamental fairness and they fail to meet the minimum standard of reason that an American statute requires to pass muster under the due process clause.

165.    Part ZZZ, Sections 9–10, and 12, as applied separately and in combination, impose unfair and unexpected burdens on Plaintiffs and cause injury to and violate rights guaranteed to Plaintiffs by the Due Process Clauses of the U.S. Constitution.

## COUNT V

### (Violation of New York Constitution Art. VII, § 6)

166.    Plaintiffs reallege each preceding paragraph as if set forth fully herein.

167.     Article VII, Section 6, of the New York Constitution "requires that all provisions of any appropriation bill, or supplemental appropriation bill, submitted by the Governor must specifically relate to an appropriation in the bill." *Ctr. for Judicial Accountability, Inc. v. Cuomo*, 167 A.D.3d 1406, 1411, 91 N.Y.S.3d 553, 559 (3d Dep't 2018) ("The purpose of this article is 'to eliminate the legislative practice of tacking on to budget bills propositions which had nothing to do with money matters; that is, to prevent the inclusion of general legislation in appropriation bills.'").

168.     Part ZZZ, Sections 9–10, and 12, are provisions of an appropriation or budget bill, but do not specifically relate to an appropriation in the bill.

169.     Part ZZZ, Sections 9–10, and 12, relate to ballot access and are fundamentally nonbudgetary.  Any relation to public financing is pretextual and its coupling is merely "a device for achieving collateral ends under the guise of budgeting." *Pataki v. New York State Assembly*, 4 N.Y.3d 75, 97, 824 N.E.2d 898, 911 (2004) (plurality decision).

170.     Part ZZZ, Sections 9–10, and 12, are therefore unconstitutional under state law.

## **PRAYER FOR RELIEF**

171.     WHEREFORE, Plaintiffs respectfully request that the Court:

> a.   Enter a declaratory judgment holding that Part ZZZ, Sections 9–10, and 12 are unconstitutional separately and in conjunction with one another;
>
> b.   Enter an order enjoining New York State officials from enforcing the challenged provisions as applied to Plaintiffs;
>
> c.   Enter an order directing the New York State Board of Elections to permit GPNY and LPNY to qualify for party status based only on the former voter and petitioning thresholds until such time as the Legislature enacts

legislation establishing constitutional thresholds to replace those

challenged herein;

d.   Award other and further relief as the Court deems proper;

e.   Award litigation costs and attorney's fees pursuant to 42 U.S.C. § 1988;

and

f.   Retain jurisdiction of this action and grant the Plaintiffs any further relief

which may in the discretion of the Court be necessary and proper.

Dated: Buffalo, New York
      July 27, 2020

                                    Respectfully submitted,


                                  By  /s/ Michael Kuzma
                                      MICHAEL KUZMA
                                      Attorney for the Plaintiffs
                                      1893 Clinton Street
                                      Buffalo, New York  14206
                                      (716) 822-7645
                                      Kuzma_Michael@hotmail.com