**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAM PARTY OF NEW YORK and MICHAEL J. VOLPE, | Case No. 1:20-cv-00323-JGK |
| Plaintiffs, | |
| v. | |
| PETER S. KOSINSKI, *et al.*, | |
| Defendants. | |
| LINDA HURLEY, *et al.*, | Case No. 1:20-cv-04148-JGK |
| Plaintiffs, | |
| v. | |
| PETER S. KOSINSKI, *et al.*, | |
| Defendants. | |
| LIBERTARIAN PARTY OF NEW YORK, *et al.*, | Case No. 1:20-cv-05820-JGK |
| Plaintiffs, | |
| v. | |
| NEW YORK STATE BOARD OF ELECTIONS, *et al.*, | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**HARRIS BEACH PLLC**
677 Broadway, Suite 1101
Albany, New York 12207
T: 518.427.9700
F: 518.427.0235

*Attorneys for Defendants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ........................................................................................................... 2

    A.    Statutory Background ........................................................................................ 2

    B.    Plaintiffs ............................................................................................................ 4

            1.    SAM .................................................................................................... 4

            2.    WFP .................................................................................................... 5

            3.    LPNY ................................................................................................... 6

            4.    GPNY .................................................................................................. 6

    C.    Procedural History ............................................................................................ 7

LEGAL STANDARD .................................................................................................................. 8

ARGUMENT ............................................................................................................................... 9

    I.    PLAINTIFFS' FEDERAL CONSTITUTIONAL CHALLENGES TO THE NEW YORK ELECTION LAW FAIL UNDER THE *ANDERSON–BURDICK* FRAMEWORK ................................ 9

        A.    The challenged provisions do not impose any severe burden on Plaintiffs because they are not virtually excluded from the ballot ........................ 10

            1.    The Party Qualification Method ..................................................... 11

            2.    The Party Qualification Threshold .................................................. 13

            3.    The Independent Nominating Petition Threshold .......................... 15

         B.    New York's important governmental interests are sufficient to justify any burdens imposed by the challenged provisions ................................. 18

    II.    PLAINTIFFS' STATE-LAW CLAIMS ARE BARRED BY THE ELEVENTH AMENDMENT ............................................................................................................. 21

CONCLUSION ........................................................................................................................... 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acevedo v. Cook Cty. Officers Electoral Bd.*,
  925 F.3d 944 (7th Cir. 2019) ................................................................... 10

*Allen v. Cuomo*,
  100 F.3d 253 (2d Cir. 1996) ..................................................................... 21

*American Party of Texas v. White*,
  415 U.S. 767 (1974) ........................................................................... 16, 17

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) .................................................................................. 9

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................. 9

*Arutunoff v. Okla. State Election Bd.*,
  687 F.2d 1375 (10th Cir. 1982) ......................................................... 12, 15

*Boyland v. Wing*,
  487 F. Supp. 2d 161 (E.D.N.Y. 2007) ............................................... 21, 22

*Brown v. Eli Lilly & Co.*,
  654 F.3d 347 (2d Cir. 2011) ..................................................................... 9

*Bullock v. Carter*,
  405 U.S. 134 (1972) ................................................................................ 19

*Burdick v. Takushi*,
  504 U.S. 428 (1992) .................................................................................. 9

*EH Fusion Party v. Suffolk Cty. Bd. of Elections*,
  401 F. Supp. 3d 376 (E.D.N.Y. 2019) .................................................... 10

*Ex Parte Young*,
  209 U.S. 123 (1908) ................................................................................ 21

*Goodheart Clothing Co. v. Laura Goodman Enters.*,
  962 F.2d 268 (2d Cir. 1992) ................................................................... 11

*Graveline v. Benson*,
  2021 U.S. App. LEXIS 9079 (Mar. 29, 2021) ........................................ 17

*Green Party of Ark. v. Martin*,
   649 F.3d 675 (8th Cir. 2011) .......................................................................... 12, 14

*Green Party of Conn. v. Garfield*,
   616 F.3d 213 (2d Cir. 2010)......................................................................................... 19

*Green Party v. N.Y. State Bd. of Elections*,
   389 F.3d 411 (2d Cir. 2004)......................................................................................... 10

*Hewes v. Abrams*,
   718 F. Supp. 163 (S.D.N.Y.) *aff'd*, 884 F.2d 74 (2d Cir. 1989)............................. 15

*Hurley v. Pub. Campaign Fin. & Election Comm'n*,
   69 Misc. 3d 254 (Sup. Ct. Niagara County 2020) ..................................................... 4

*Johnson v. Xerox Corp.*,
   833 F. Supp. 2d 99 (W.D.N.Y. 2011) ......................................................................... 8

*Libertarian Party of Ky. v. Grimes*,
   835 F.3d 570 (6th Cir. 2016) ............................................................................ 12, 19

*Libertarian Party v. Lamont*,
   977 F.3d 173 (2d Cir. 2020)................................................................................ 9, 11, 12

*Maine Green Party v. Maine*,
   173 F.3d 1 (1st Cir. 1999) ........................................................................................... 13

*McLaughlin v. N.C. Bd. of Elections*,
   65 F.3d 1215 (4th Cir. 1995) ...................................................................................... 14

*Munro v. Socialist Workers Party*,
   479 U.S. 189 (1986)............................................................................................ 11, 18, 20

*N.Y. State Corr. Officers & Police Benevolent Ass'n v. New York*,
   911 F. Supp. 2d 111 (N.D.N.Y. 2012) ...................................................................... 22

*Naser Jewelers, Inc. v. City of Concord*,
   538 F.3d 17 (1st Cir. 2008) ........................................................................................ 11

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984)...................................................................................................... 22

*Person v. N.Y. State Bd. of Elections*,
   467 F.3d 141 (2d Cir. 2006)................................................................................ 12, 13, 19

*Prestia v. O'Connor*,
    178 F.3d 86 (2d Cir. 1999).................................................................................. 15

*Price v. N.Y. State Bd. of Elections*,
    540 F.3d 101 (2d Cir. 2008)........................................................................... 18, 21

*Robinson v. Concentra Health Servs., Inc.*,
    781 F.3d 42 (2d Cir. 2015)................................................................................... 9

*SAM Party of N.Y. v. Kosinski*,
    483 F. Supp. 3d 245 (S.D.N.Y. 2020)......................................................... passim

*SAM Party of N.Y. v. Kosinski*,
    987 F.3d 267 (2d Cir. 2021)........................................................................ passim

*Schulz v. Williams*,
    44 F.3d 48 (2d Cir. 1994).................................................................................. 10

*Storer v. Brown*,
    415 U.S. 724 (1974)................................................................................. 9, 16, 17

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997)............................................................................ 9, 18, 19, 21

*UP State Tower Co., LLC v. Town of Southport*,
    468 F. Supp. 3d 583 (W.D.N.Y. 2020) ............................................................... 8

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)............................................................................................. 9

**Statutes**

28 U.S.C. § 1983 ........................................................................................................ 7

2019 N.Y. Sess. Laws, Ch. 59, Part XXX, § 1(a)..................................................... 3

2019 N.Y. Sess. Laws, Ch. 59, Part XXX, § 5 ......................................................... 4

2020 N.Y. Sess. Laws, Ch. 58, Part ZZZ................................................................. 3

Cal. Elec. Code §§ 8400, 8403(a)(2) ...................................................................... 16

N.M. Stat. Ann. §§ 1-8-45, 1-8-50, 1-8-51, and 1-8-52......................................... 16

N.Y. Elec. Law § 1-104(12) (2019) ......................................................................... 3

N.Y. Elec. Law § 1-104(3) (2019) ........................................................................... 3

N.Y. Elec. Law § 6-128(1) ...................................................................................... 5

N.Y. Elec. Law § 6-142(1) .................................................................................. 4, 15

Or. Rev. Stat. Ann. §§ 249.722, 249.740 ............................................................. 16

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................... 8

**Other Authorities**

18 Moore's Fed. Practice § 134.22(1)(a) ............................................................. 12

Defendants respectfully submit this memorandum of law in support of their motions for summary judgment in the above-captioned actions.

## PRELIMINARY STATEMENT

For decades, the party-qualification and ballot-access thresholds in New York remained the same, even as the number of registered voters multiplied. As a result, the number of recognized political parties grew. Even for those groups that were not qualified parties, the relatively low threshold for independent nominating petitions meant that statewide ballots were full—and often overfull—of candidates that had no realistic chance of electoral success. The result was long and confusing ballots, cluttered with hopeless candidacies. Responding to these concerns and outdated laws—and seeking to pave the way for a new, fiscally responsible system of public campaign financing—the state legislature adopted amendments in April 2020 to the method and threshold for party qualification and also to the thresholds for independent nominating petitions.

The results of the November 2020 election reveal that while qualifying for party status is more difficult than in the past, it is hardly impossible: two so-called minor parties, including the Working Families Party, readily requalified and received far more votes than needed on their party lines to retain their party status. As such, the entire premise of these actions filed before the November 2020 election—that New York's new election laws are so restrictive that they will eviscerate so-called minor parties in the State of New York—is belied by the actual results of that election. As for the parties that failed to requalify, they can still participate in New York elections as independent bodies, as each of them has done in the past. But they must first demonstrate a "significant modicum of support" from the electorate before receiving a berthing on the ballot for their candidates—a requirement that courts have repeatedly held to be a valid and constitutional exercise of state power over the electoral process.

The Second Circuit's decision at the preliminary injunction stage in the SAM Party action leaves little room for doubt as to the proper disposition of Plaintiffs' challenges here. The court's opinion addressed each of the challenged aspects of the New York Election Law, including the use of presidential election returns, the 2% party-qualification threshold, and the increased thresholds for independent nominating petitions. The court held that these reforms did not impose a severe burden on the SAM Plaintiffs' constitutional rights and that they were amply supported by the State's proffered governmental interests.

Under the *Anderson–Burdick* framework, the Second Circuit's holdings doom Plaintiffs' federal constitutional challenges, regardless of whether they are framed as First Amendment speech and associational rights claims, equal protection claims, or due process claims. Summary judgment on these claims is appropriate because (i) the essential facts are undisputed and (ii) the application of those facts to the legal framework has already been determined by the Second Circuit.

That leaves only the state-law constitutional challenges asserted by certain Plaintiffs. Those claims are barred by the Eleventh Amendment, which does not permit federal courts to entertain suits against state officials that assert violations of state law. Accordingly, Plaintiffs' state-law claims should likewise be dismissed.

## STATEMENT OF FACTS

The facts relevant to Defendants' motion are fully set forth in the accompanying Statement of Material Facts ("SMF") and in the Declaration of Robert A. Brehm ("Brehm Decl.").

### A.    Statutory Background

For the sake of brevity, Defendants will not repeat the full statutory background and history of the 2020 amendments to the New York Election Law, which are set forth in Defendants' prior

memoranda of law,[1] in this Court's decision in *SAM Party of N.Y. v. Kosinski*, 483 F. Supp. 3d 245 (S.D.N.Y. 2020) ("*SAM Party I*"), and in the Second Circuit's decision in *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267 (2d Cir. 2021) ("*SAM Party II*").

The New York Election Law distinguishes between parties and independent bodies, which have different processes for accessing the general-election ballot. For 85 years, between 1935 and 2020, an organization became a statutory "party" if its nominee for governor received at least 50,000 votes on that organization's ballot line. N.Y. Elec. Law § 1-104(3) (2019); Brehm Decl. ¶¶ 17–19. An organization that did not meet that threshold was designated as an independent body. N.Y. Elec. Law § 1-104(12) (2019).

In 2019, the New York Legislature created a Campaign Finance Review Commission to design a state program of public financing for elections. The Commission was tasked with recommending new laws to establish "a system of voluntary public campaign financing for state-wide and state legislative public offices." 2019 N.Y. Sess. Laws, Ch. 59, Part XXX, § 1(a). The state legislature also asked the Commission to "determine and identify new election laws" on various topics, including "rules and definitions governing ... political party qualifications." *Id.* § 2.

The Commission issued its recommendations in December 2019, which were subsequently adopted by the New York Legislature as Part ZZZ of the state budget law enacted in April 2020. *See* 2020 N.Y. Sess. Laws, Ch. 58, Part ZZZ. The Legislature made two changes to New York's system of party qualification. First, it increased the frequency for requalification. Instead of quali-fying every four years based on the gubernatorial election, parties must now requalify every two years based on both the gubernatorial and presidential election returns. Second, it increased the vote threshold, updating the 50,000-vote threshold in effect since 1935 with a new requirement

---

[1] *See* SAM Dkt. 84; WFP Dkt. 39; LPNY-GPNY Dkt. 53.

that the party receive the greater of 130,000 votes or 2% of the vote cast for its candidate on its ballot line. *See* Brehm Decl. ¶¶ 17–19; Hallak Decl. Ex. A at 14–15.

The Commission also recommended, and the Legislature adopted,[2] an increase in the number of signatures needed for independent nominating petitions. For statewide offices, the former threshold of 15,000 signatures was replaced by a requirement to submit the lesser of 45,000 signatures or signatures representing 1% of the total votes (excluding blank and void ballots) for governor in the last gubernatorial election. Like the vote threshold, this change constituted a long overdue adjustment for the nearly four-fold increase in the New York electorate over the last century. *See* Brehm Decl. ¶¶ 9, 54–58; N.Y. Elec. Law § 6-142(1).

## B.    Plaintiffs

Plaintiffs in these three actions represent four political organizations that qualified as statutory parties based on the 2018 gubernatorial election results: the SAM Party of New York ("SAM"), the Working Families Party ("WFP"), the Libertarian Party of New York ("LPNY"), and the Green Party of New York ("GPNY"). Following the 2020 presidential election, SAM, LPNY, and GPNY failed to requalify as statutory parties. The WFP requalified and will remain a statutory party for the following two-year election cycle.

### 1.    SAM

SAM was founded in 2017. The next year, as an independent body, it nominated a candidate for governor via an independent nominating petition. SMF ¶ 32. SAM's candidate received 51,441 votes (0.89%), qualifying SAM as a party under the then-applicable threshold. *Id.* ¶¶ 33–34. Two

---

[2] The law creating the Commission provided that its recommendations were to become law unless modified or abrogated by the state legislature by December 22, 2019. *See* 2019 N.Y. Sess. Laws, Ch. 59, Part XXX, § 5. However, in March 2020, a state court held this to be an improper delegation of lawmaking power to the Commission. *See Hurley v. Pub. Campaign Fin. & Election Comm'n*, 69 Misc. 3d 254 (Sup. Ct. Niagara County 2020).

years later, SAM had only 649 enrolled members, representing 0.0048% of New York's 13.56 million registered voters. *Id.* ¶ 35. Despite this small enrollment, SAM was able to take advantage of relaxed nominating requirements applicable to new parties (see N.Y. Elec. Law § 6-128(1)) to nominate more than 100 candidates for various offices, who were primarily cross-nominated candidates of the Democratic Party and Republican Party. *Id.* ¶ 36. There is no evidence that an enrolled SAM candidate has ever won an election or that SAM's cross-nomination of another party's candidate was ever a deciding factor in any race.

SAM's party rules do not prevent it from nominating a presidential candidate. SMF ¶ 37. And its former national website used to state that "[i]n all 50 states, from dog catcher to president, SAM will run candidates who care about the issues you care about." *Id.* ¶ 38. Nevertheless, SAM chose not to run a presidential candidate in the 2020 election, despite running and cross-endorsing other candidates for federal office in the same election. *Id.* ¶¶ 39–40. In the 2020 general election, SAM was the only recognized party that did not run a presidential candidate and left its ballot line blank. Consequently, SAM did not requalify as a statutory party in the 2020 election. *Id.* ¶ 41. It is now an independent body and can place candidates on the ballot through independent nominating petitions that contain the requisite number of signatures.

### 2. WFP

WFP was founded in 1998. SMF ¶ 42. It successfully nominated a candidate for governor the same year through the independent nominating process and received enough votes to thereafter qualify as a party. *Id.* In every gubernatorial and presidential election since 1998, WFP has cross-nominated the Democratic Party's candidate, which is permitted under New York's fusion voting system. *Id.* ¶ 45.

WFP's enrolled membership remains modest, with only 48,207 members who represent 0.36% of New York registered voters. *Id.* ¶ 44. Nevertheless, in four of the last seven elections

WFP has received more than 130,000 votes or 2% of the vote. *Id.* ¶ 43. In the 2020 general election, WFP received 386,010 votes (4.46%) on its ballot line for president, which was more than double what it needed in order to requalify as a statutory party. *Id.* ¶¶ 48–50.

### 3.    LPNY

LPNY is affiliated with the national Libertarian Party. SMF ¶ 52. Between 1974 and 2018, as an independent body, LPNY submitted independent nominating petitions in each presidential election and in each gubernatorial election in New York, except for the 1986 gubernatorial election. *Id.* ¶ 53. LPNY regularly obtained more than 25,000 signatures on its statewide nominating petitions, even exceeding 33,000 on a certain occasions. *Id.* ¶ 54. In 2018, for the first time, LPNY obtained statutory party status when its candidate for governor received 95,033 votes (1.56%)— by far the largest measure of voter support LPNY has ever obtained. *Id.* ¶ 55. In over 40 years, in every other gubernatorial election, LPNY failed to meet the 50,000-vote threshold. *Id.* ¶ 56.

LPNY's representative testified that although it is important for the national Libertarian Party to be on the ballot in New York, the state is "pretty much a lost cause" since it "is not seen as a state where money would be well spent promoting the Libertarian agenda." *Id.* ¶ 60. As of November 2020, LPNY had 21,551 enrolled members, representing 0.16% of the State's registered voters. *Id.* ¶ 57. As a result of its failure to meet the requalification threshold, LPNY lost its party status and is now an independent body. *Id.* ¶ 59.

### 4.    GPNY

GPNY is affiliated with the national Green Party. SMF ¶ 61. In every gubernatorial and presidential election since 1996, GPNY has nominated a candidate, except for the 2004 presidential election, when it ran a write-in candidate. *Id.* ¶ 62. In New York, GPNY has gained and lost party status several times based upon its electoral performance. In 1998, it successfully submitted an independent nominating petition for governor and its candidate received 52,533 votes (1.05%). *Id.*

¶ 63. Under then-existing law, that was sufficient to qualify GPNY as a party. *Id.* ¶ 64. GPNY lost that status four years later, when its candidate in the 2002 gubernatorial election received only 41,797 votes (0.91%). *Id.* ¶ 65. GPNY regained its party status in 2010 when its candidate received 59,906 votes (1.26%). *Id.* ¶ 67. GPNY regularly obtained between 25,000 and 30,000 signatures for its candidates for statewide office. *Id.* ¶ 66.

As of November 2020, GPNY had 28,501 enrolled members, representing 0.21% of the State's registered voters. *Id.* ¶ 68. In the 2020 general election, GPNY received 32,753 votes (0.38%) for its presidential candidate. *Id.* ¶ 69. Consequently, GPNY is now an independent body. *Id*. ¶ 70.

## C.     Procedural History

The SAM Plaintiffs filed their original complaint in January 2020, directed toward the Commission's recommendations, which at the time were still being challenged in state court. After the recommendations were enacted in the April 2020 budget bill, the SAM Plaintiffs amended their complaint to assert three civil rights claims under Section 1983 (28 U.S.C. § 1983), alleging that the use of presidential-election returns for party qualification violates the SAM Plaintiffs' freedom of association under the First Amendment (count one), constitutes compelled speech in violation of the First Amendment (count two), and violates the due process and equal protection clauses of the Fourteenth Amendment (count three). *See* SAM Action, Dkt. 62.

In May 2020, the WFP Plaintiffs filed a complaint challenging both the use of presidential election returns and the increased 2% or 130,000 vote threshold. WFP Plaintiffs assert four claims under Section 1983: violation of WFP Plaintiffs' associational rights under the First Amendment (counts one and two) and violation of due process and equal protection under the Fourteenth Amendment (counts three and four). The WFP Plaintiffs further allege a violation of the New York State Constitution (count five). *See* WFP Action, Dkt. 1.

The SAM and WFP Plaintiffs both moved for preliminary injunctions. After consolidated briefing and argument on the motions, this Court denied both motions, holding, among other things, that the SAM and WFP Plaintiffs failed to demonstrate a likelihood of success on the merits. *SAM Party I*, 483 F. Supp. 3d at 256–65. The SAM Plaintiffs appealed, and the Second Circuit affirmed, agreeing that the SAM Plaintiffs had not shown a likelihood of success on the merits. *SAM Party II*, 987 F.3d at 274–78.

Meanwhile, the LPNY and GPNY Plaintiffs commenced their action in July 2020. In addition to challenging the party-qualification method and threshold, these Plaintiffs also challenge the increased signature requirements for independent nominating petitions. They assert claims under Section 1983 for violation of First Amendment rights (count one), an equal protection claim (count two), due process claims (counts three and four), and a claim that Part ZZZ violates the New York State Constitution (count five). *See* LPNY-GPNY Action, Dkt. 1. In December 2020, LPNY and GPNY filed a motion for a preliminary injunction, which remains pending.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing that there is no genuine dispute as to any material fact. *UP State Tower Co., LLC v. Town of Southport*, 468 F. Supp. 3d 583, 589 (W.D.N.Y. 2020). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Id.* (quoting *Johnson v. Xerox Corp.*, 833 F. Supp. 2d 99, 103 (W.D.N.Y. 2011)).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory

allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

## ARGUMENT

I.   **PLAINTIFFS' FEDERAL CONSTITUTIONAL CHALLENGES TO THE NEW YORK ELECTION LAW FAIL UNDER THE *ANDERSON–BURDICK* FRAMEWORK.**

The United States Constitution grants States "broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008). States "may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *see Storer v. Brown*, 415 U.S. 724, 730 (1974). Although virtually every state election regulation will "invariably impose some burden" upon First and Fourteenth Amendment rights, the Supreme Court has recognized that to subject all state election regulations to strict scrutiny "would tie the hands of states seeking to [ensure] that elections are operated equitably and efficiently." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983)).

"Challenges to state action restricting ballot access are evaluated under the *Anderson–Burdick* framework." *Libertarian Party v. Lamont*, 977 F.3d 173, 177 (2d Cir. 2020); *see SAM Party II*, 987 F.3d at 274. This test applies to all election-law challenges brought under the First or

Fourteenth Amendments, whether those challenges are framed as based on free-speech rights, associational rights, equal protection, substantive due process, or procedural due process. *See Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 420 (2d Cir. 2004) (analyzing First Amendment and equal protection claims together); *EH Fusion Party v. Suffolk Cty. Bd. of Elections*, 401 F. Supp. 3d 376, 390 (E.D.N.Y. 2019) (same); *see also Acevedo v. Cook Cty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019) ("[The *Anderson–Burdick*] test applies to *all* First and Fourteenth Amendment challenges to state election laws.") (emphasis added).

To determine whether a particular regulation is constitutional under the *Anderson–Burdick* framework, courts first examine the extent to which the challenged law burdens the plaintiff's constitutional rights. *Burdick*, 504 U.S. at 434. Only if the burden is "severe" will the court apply strict scrutiny. *Id.* If, on the other hand, the regulation is "reasonable" and "nondiscriminatory," then "the State's important regulatory interests are generally sufficient to justify [it]." *Id.* (quoting *Anderson*, 460 U.S. at 788).

Here, summary judgment is warranted because the challenged provisions of the New York Election Law do not impose a severe burden upon Plaintiffs and because whatever minimal burden that they do impose is amply justified by the important governmental interests—which have been repeatedly recognized by the Supreme Court—that the provisions address.

### A.     The challenged provisions do not impose any severe burden on Plaintiffs because they are not virtually excluded from the ballot.

To determine whether an alleged burden is "severe" under the *Anderson–Burdick* framework, courts apply a "totality approach" that views the challenged provision "in light of the state's overall election scheme." *Schulz v. Williams*, 44 F.3d 48, 56 (2d Cir. 1994) (cleaned up). The Second Circuit has identified three types of electoral regulations that constitute severe burdens: (1) those that "meddl[e] in a political party's internal affairs"; (2) those that "restrict[] the core

associational activities of the party or its members"; or (3) those "that 'make it virtually impossible' for minor parties to qualify for the ballot." *SAM Party II*, 987 F.3d at 275; *see also Lamont*, 977 F.3 at 177 ("the hallmark of a severe burden is exclusion or virtual exclusion from the ballot") (cleaned up). A state election law is less likely to impose a severe burden if "minor party candidates have other channels to seize upon the 'availability of political opportunity.'" *SAM Party I*, 483 F. Supp. 3d at 257 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 199 (1986)).

Applying this standard to Plaintiffs' challenges here, the undisputed facts show that none of the challenged provisions of the 2020 amendments to the New York Election Law imposes a severe burden upon Plaintiffs' constitutional rights.

### 1.     The Party Qualification Method

All Plaintiffs challenge the new requirement that statutory parties requalify every two years instead of every four years, based on the results of both the gubernatorial and presidential elections—what this Court has referred to as the "Party Qualification Method." In *SAM Party I*, this Court concluded that, "based on precedent from similar election laws and other avenues available to the SAM Party and the WFP for supporting candidates for public office, the burdens imposed by the ... Party Qualification Method ... are not severe." 483 F. Supp. 3d at 258.

In *SAM Party II*, the Second Circuit agreed with this Court's determination, concluding that "the presidential-election requirement does not impose a severe burden on the SAM Party." 987 F.3d at 276. While an appellate ruling on a party's likelihood of success on the merits does not ordinarily preclude the consideration of the merits of the case, *see Goodheart Clothing Co. v. Laura Goodman Enters.*, 962 F.2d 268, 274 (2d Cir. 1992), the law-of-the-case doctrine can preclude relitigation of issues that were fully developed and presented at the preliminary-injunction stage, *see Naser Jewelers, Inc. v. City of Concord*, 538 F.3d 17, 20 (1st Cir. 2008) (law-of-the-case

doctrine applied where prior appeal affirmed denial of motion for preliminary injunction and the summary judgment record "did not significantly change" from the record on the prior appeal); *see also* 18 Moore's Fed. Practice § 134.22[1][a].

None of the essential facts has changed since *SAM Party II*. The Second Circuit concluded that the Party Qualification Method does not burden SAM's "core associational activities" because "[a] law that ties party status to a political organization's demonstrated support in a designated race does not 'force' the organization 'to divert its resources in any particular way'" and SAM "remain[s] 'free to choose not to seek official status.'" 987 F.3d at 275 (quoting *Person v. N.Y. State Bd. of Elections*, 467 F.3d 141 (2d Cir. 2006)). That remains true not just as to SAM, but as to the other Plaintiffs as well.

The Second Circuit also held that the Party Qualification Method did not impose any severe burden on the development of minor parties like SAM because it did not amount to "exclusion or virtual exclusion from the ballot." *Id.* (quoting *Lamont*, 977 F.3d at 177). The Second Circuit based this conclusion on the fact that the 2% requirement was modest compared to many other states (which remains true) and because SAM could still participate in New York elections as an independent body (which remains also true). *Id.* at 275–76.

The Second Circuit's decision in *SAM Party II* is also in accord with the decisions of other courts of appeals that have addressed similar challenges. *Green Party of Ark. v. Martin*, 649 F.3d 675 (8th Cir. 2011) (upholding law requiring parties requalify biennially based upon 3% showing in gubernatorial and presidential elections); *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570 (6th Cir. 2016) (upholding law conditioning party status of receipt of 2% of vote in the last presidential election); *Arutunoff v. Okla. State Election Bd.*, 687 F.2d 1375 (10th Cir. 1982) (upholding law that required parties to recertify by obtaining 10% of the presidential vote); *see also Maine Green Party*

*v. Maine*, 173 F.3d 1 (1st Cir. 1999) (affirming judgment upholding Maine law that required parties to requalify by receiving 5% of the presidential vote).

Finally, both this Court and the Second Circuit have rejected the SAM Plaintiffs' argument that the Party Qualification Method amounts to compelled speech. SAM was not forced to run a presidential candidate, to speak to any national issues, or to divert its resources in a particular way, as SAM remains free to participate in the political arena as an independent body. *See SAM Party II*, 987 F.3d at 275 ("We thus reject the claim that the presidential-election requirement compels speech."); *SAM Party I*, 483 F. Supp. 3d at 259–61; *accord Person*, 467 F.3d at 275 (holding that using gubernatorial election returns did not "force" a political organization "to divert its resources in any particular way").

In sum, the reasoning and conclusion of the Second Circuit in *SAM Party II* leaves no room for doubt: the Party Qualification Method does not impose a severe burden that would trigger strict scrutiny under *Anderson–Burdick*.

## 2.    The Party Qualification Threshold

The WFP, LPNY, and GPNY Plaintiffs challenge the threshold for achieving statutory party status, which requires an organization's candidate for president or governor (depending on the cycle) to receive the greater of 2% of the vote or 130,000 votes—what this Court has referred to this as the "Party Qualification Threshold." This Court has already concluded, in *SAM Party I*, that "based on precedent from similar election laws and the other avenues available to the SAM Party and the WFP for supporting candidates for public office, the burdens imposed by the Party Qualification Threshold ... to demonstrate a modicum of voter support are not severe." 483 F. Supp. 3d at 258.

In *SAM Party II*, while the appellants did not directly challenge the Party Qualification Threshold, the Second Circuit addressed the issue as part of its assessment of the burden posed by

the overall statutory scheme. The court held that the Party Qualification Threshold "does not 'virtually exclude' minor parties form the ballot," describing New York's 2% threshold as being "in the middle of the pack." *Id.* Indeed, New York's 2% requirement is relatively modest compared to other states, some of which require showings of 3%, 4%, 5%, 10%, or even as high as 20% of the vote in specified elections. *See* Hallak Decl. Ex. F. Moreover, the lack of any severe burden imposed by a 2% requirement is demonstrated by the 2020 general election results, in which four parties requalified by significant margins, including two so-called minor parties, Plaintiff WFP and the Conservative Party. *See* Brehm Decl. Ex. I.

The 2% threshold does not freeze the status quo. Recent history shows that the fortunes of political parties tend to rise and fall over time. For example, GPNY has, on two occasions, garnered more than 2% of the vote in a statewide election. In 2000, its candidate for president, Ralph Nader, won 244,398 votes (3.6%) in New York. *Id.* And in 2014, its candidate for governor, Howie Hawkins, received 184,419 votes (4.8%). *Id.* In the 2020 presidential election, the same candidate, Howie Hawkins, only received 32,753 votes (0.38%). *Id.* Other so-called minor parties have met the current Party Qualification Threshold requirements in prior elections. *See* Brehm Decl. ¶ 21. Parties that lost their party status in 2020 can run candidates and regain party status in future election cycles so long as they replicate this level of success—which history shows to be feasible.

A 2% threshold for party status is also well within the bounds of established precedent. As the Second Circuit noted, "several federal courts of appeals have approved thresholds as high or higher." *SAM Party II*, 987 F.3d at 275–76 (citing *Martin*, 649 F.3d at 682–83 (upholding 3% presidential-election requirement); *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1222–23 (4th Cir. 1995) (upholding 10% presidential-election requirement for party requalification); and

*Arutunoff*, 687 F.2d at 1379 (same)). Accordingly, the Party Qualification Threshold does not impose a severe burden on Plaintiffs.

### 3.      The Independent Nominating Petition Threshold

The LPNY and GPNY Plaintiffs also challenge the increased signature requirement for statewide independent nominating petitions, which now require signatures from the lesser of 45,000 voters or 1% of voters in the last gubernatorial election. N.Y. Elec. Law § 6-142(1). Once again, the Second Circuit, though not presented with a direct challenge to the number of signatures required for independent nominating petitions, nevertheless addressed the issue as part of its assessment of the overall burden imposed by statutory scheme.

The Second Circuit concluded that the overall burden was not severe in part because of the availability of independent nominating petitions as an alternative means of ballot access. *SAM Party II*, 987 F.3d at 276. The court held that the signature requirements to nominate candidates for statewide and local races "pale in comparison to the ones the Supreme Court upheld in *Jenness v. Fortson*, 403 U.S. 431 (1971)." *SAM Party II*, 987 F.3d at 276. The court concluded that "a requirement as high as 5% 'in no way freezes the status quo' and thus does not "abridge the rights of free speech and association secured by the First and Fourteenth Amendments." *Id.* (quoting *Jenness*, 403 U.S. at 439–40) (brackets omitted); *see also Prestia v. O'Connor*, 178 F.3d 86, 88 (2d Cir. 1999) (upholding requirement that designating petition for party primary nominations be signed by 5% of enrolled party members in the relevant district); *Hewes v. Abrams*, 718 F. Supp. 163, 167 (S.D.N.Y. 1989) ("[U]nder *Jenness* a standardized 5% signature requirement would be constitutional ...."), *aff'd*, 884 F.2d 74, 75 (2d Cir. 1989) ("We affirm substantially for the reasons stated by [the district judge] in his thorough opinion ...."). Thus, *SAM Party II* reaffirmed longstanding precedent in this Circuit that a signature requirement of 5% or less for ballot-access petitions is constitutional.

Plaintiffs complain that the time period in which organizations may gather the requisite signatures is too short. But New York is no outlier. As Defendants have previously demonstrated,[3] there are at least three other states that require more signatures per day when measured as a percentage of a state's electorate: California, Oregon, and New Mexico. *See* Hallak Decl. Ex. I.[4]

The GPNY and LPNY Plaintiffs' argument that the time period at issue creates a severe burden is foreclosed by Supreme Court precedent. In *American Party of Texas v. White*, 415 U.S. 767 (1974), the plaintiffs challenged a Texas law that required certain nominating petitions to contain signatures of 1% of the voters in the last gubernatorial election (then 22,000 signatures), collected over a period of 55 days. In rejecting the plaintiffs' challenge to the 55-day time period, the Supreme Court noted that it would require 100 canvassers collecting only four signatures per day to meet the requirement. Further noting that "[h]ard work and sacrifice by dedicated volunteers are the lifeblood of any political organization," the Court concluded that it was "unimpressed with arguments that burdens like those imposed by Texas are too onerous." *Id.* at 787.

Likewise, in *Storer*, the Court evaluated a California law, which required independent candidates for statewide office to obtain 5% of the total votes cast in the preceding election for the same office. 415 U.S. at 726–27. These signatures, amounting to 325,000 signatures, were required to be collected in 24 days. *Id.* at 740. Although the Court remanded the case for additional fact-finding pertaining to restrictions on eligible signors not relevant here, the Court stated that, "[s]tanding alone, gathering 325,000 signatures in 24 days would not appear to be an impossible

---

[3] LPNY-GPNY Dkt. 53, at 20–22.

[4] *See* Cal. Elec. Code §§ 8400, 8403(a)(2) (requiring 1% of registered voters to sign petition within 105 days); Or. Rev. Stat. Ann. §§ 249.722, 249.740 (requiring 1% of voters in last presidential election within 91 days); N.M. Stat. Ann. §§ 1-8-45, 1-8-50, 1-8-51, and 1-8-52 (requiring 2% of voters in last gubernatorial election within 125 days).

burden. Signatures at the rate of 13,542 per day would be required, but 1,000 canvassers could perform the task if each gathered 14 signers a day." *Id.*

Here, New York's requirement that statewide independent nominating petitions contain 45,000 signatures is far less onerous. Spread across 100 canvassers (as the Supreme Court assumed in *White*), it would require the average canvasser to collect only 11 valid signatures per day over the 42-day collection period. Higher rates per day were found not to be severely burdensome in *White* and *Storer*, both of which were decided decades ago. In the age of social media, email lists, and voter databases, parties have more ways than ever to connect to their supporters and organize signature-gathering efforts.

In sum, the Second Circuit was correct when it held that "a reasonably diligent organization could be expected to satisfy New York's signature requirement" for independent nominating petitions. *SAM Party II*, 987 F.3d at 276 (cleaned up). Under established precedent, New York's signature requirements for independent nominating petitions do not severely burden Plaintiffs' constitutional rights.[5] Moreover, the record reflects that for many decades in gubernatorial and presidential election cycles when GPNY and LPNY did not have party status, they were readily able to place presidential and gubernatorial candidates on the ballot through independent nominating petitions. As noted above, the increased independent nominating petition requirement

---

[5] The Sixth Circuit's recent decision in *Graveline v. Benson*, 2021 U.S. App. LEXIS 9079 (Mar. 29, 2021), which held that Michigan's rules for independent petitions were unconstitutional, does not help Plaintiffs here. The court in *Graveline* focused on the fact that independent candidates faced deadlines far in advance of party primaries, *see id.* at *22–28, which is not the case in New York (*see* Brehm Decl. Exs. J–L). Moreover, the court was persuaded by the fact that no independent candidate had successfully complied with Michigan's requirements since it was implemented in 1988. *Id.* at *30. Here, by contrast, New York was responding to the opposite problem, which is overcrowded ballots caused by the ease with which parties and independent bodies achieved ballot access under outdated laws. Many of those candidates had no realistic chance of success and routinely received only negligible percentages of the vote.

merely amounts to a proportional increase based upon the increase in registered voters since the prior threshold was first enacted nearly a century ago. *See* Brehm Decl. ¶ 57.

## B.   New York's important governmental interests are sufficient to justify any burdens imposed by the challenged provisions.

The second *Anderson–Burdick* step involves weighing the interests put forward by the State against the alleged burden on the plaintiff's rights. *SAM Party II*, 987 F.3d at 274. "Review under this balancing test is 'quite deferential' and no 'elaborate, empirical verification' is required." *Id.* (quoting *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008)). "A State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* at 276 (quoting *Timmons*, 520 U.S. at 538) (cleaned up)).

The challenged amendments to the New York Election Law further the State's interests in avoiding ballot overcrowding, reducing voter confusion, and preventing frivolous candidacies. Having too many candidates, parties, and independent bodies appearing on a ballot confuses voters and causes a host of problems for state election administration. Given the need to print ballot instructions in multiple languages, there are only so many ballot lines (or columns) that can fit on a ballot. *See* Brehm Decl. ¶¶ 27–30. Too many candidates can result in independent bodies sharing ballot lines or in multi-page ballot designs. *Id.* ¶ 30. The summary judgment record includes numerous examples of confusing ballot designs from recent gubernatorial elections in which anywhere from 9 to 11 candidates qualified and up to three parties were listed on the same ballot line. *See* Brehm Decl. Exs. C–F.

Courts have repeatedly recognized that states have important, if not compelling, interests in reducing ballot overcrowding, voter confusion, and frivolous candidacies. *See Jenness*, 403 U.S. at 442 (recognizing states' interests "in avoiding confusion, deception, and even frustration of the democratic process at the general election"); *Munro*, 479 U.S. at 194-95 (recognizing states

interests in preventing voter confusion, ballot overcrowding, and the presence of frivolous candidacies); *Person*, 467 F.3d at 144 ("states may limit ballot access in order to prevent 'the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting'") (quoting *Bullock v. Carter*, 405 U.S. 134, 145 (1972)); *see also Grimes*, 835 F.3d at 578 (states' interests in "avoiding voter confusion, ballot overcrowding, and frivolous candidacies" are "central to the regulation of elections").

New York also has an important interest "in not funding hopeless candidacies" through its newly established public campaign financing program. *Green Party of Conn. v. Garfield*, 616 F.3d 213, 232 (2d Cir. 2010). New York's program will make available up to $100 million per year of public funds to candidates, beginning after the 2022 general election. New York's unquestionably "valid interest in making sure minor and third parties who are granted access to the ballot are bona fide and actually supported" by a significant quantum of voters is more pronounced now that candidates nominated by parties with a small number of enrolled members will be potentially eligible to receive public funds. *Timmons*, 520 U.S. at 366.

Finally, New York has an interest in reducing the costs and burdens imposed on the State and its political subdivisions by minor parties with very small enrollment. For example, even though SAM had less than 700 enrolled members in 2020, the State had to run—and each county had to pay for—a primary election for SAM. Even in counties in which SAM had no enrolled members, county boards of elections had to prepare ballots and polling sites. *See* Brehm Decl. ¶¶ 45–47 & Ex. H. Minor parties also increase the administrative burden on the State Board of Elections, which must monitor compliance with various filing requirements and maintain voter enrollment rolls for each party. *Id.* ¶¶ 48–49.

In *SAM Party I*, this Court concluded that these interests were "sufficiently weighty" as to justify the reasonable, nondiscriminatory Party Qualification Threshold and Party Qualification Method. 483 F. Supp. 3d at 261. Likewise, in *SAM Party II*, the Second Circuit held that Defendants had "set forth a coherent account of why the presidential-election requirement [*i.e.*, the Party Qualification Method] will help to guard against disorder and waste," concluding that the interests were "enough to justify the burden the requirement imposes on the SAM Party's members." 987 F.3d at 278.

The Court should reach the same conclusion again on this record. The State has set forth a reasonable and coherent account of its interests in reducing ballot overcrowding, voter confusion, and frivolous candidacies, as well as limiting future public expenditure as part of the State's new public campaign financing system. By raising thresholds for party qualification and ballot access, New York is ensuring that both party-nominated candidates and independently nominated candidates have demonstrated a "significant modicum of support" prior to their placement of the ballot or their acceptance of public funds. *Jenness*, 403 U.S. at 442. The State has therefore satisfied the relatively minimal burden imposed by the *Anderson–Burdick* framework to justify its politically neutral and reasonable election laws.

Plaintiffs cannot raise questions of fact by trying to probe behind the State's articulated reasons to determine whether they are supported by empirical proof. *See Munro*, 479 U.S. at 194–95 ("We have never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of

reasonable restrictions on ballot access."); *Timmons*, 520 U.S. at 364 ("Nor do we require elaborate, empirical verification of the weightiness of the State's asserted justifications.").[6] Nor can Plaintiffs raise issues of fact by speculating about whether the State's chosen measures are necessary to achieve its ends. *See SAM Party II*, 987 F.3d at 277 ("[E]ven if the State has installed other measures aimed at preventing nonviable candidacies from receiving public funds, it may pursue multiple avenues towards that goal.").

Under the "quite deferential" standard of review applicable to the challenged provisions of the New York Election law, the State has amply met its burden to demonstrate that any incidental burden imposed on Plaintiffs are justified by the State's interests. *Id.* at 276, 278 (quoting *Price*, 540 F.3d at 109).

## II.   PLAINTIFFS' STATE-LAW CLAIMS ARE BARRED BY THE ELEVENTH AMENDMENT.

The WFP, LPNY, and GPNY Plaintiffs all assert a claim alleging that Part ZZZ violates Article VII, Section 6 of the New York State Constitution. However, "[t]he Eleventh Amendment bars federal suits against state governments by a state's own citizens," including suits seeking "relief against state officials for alleged violations of state law." *Boyland v. Wing*, 487 F. Supp. 2d 161, 180, 182 (E.D.N.Y. 2007) (cleaned up); *see Allen v. Cuomo*, 100 F.3d 253, 260 (2d Cir. 1996) ("The Eleventh Amendment bars federal suits against state officials on the basis of state law."). While the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), allows federal courts to exercise jurisdiction over federal constitutional claims seeking prospective relief against state officers in their official capacity, the doctrine "does not extend to state-law claims asserted against state

---

[6] In any event, the Commission's report sets forth its motivations behind recommending the adoption of the new rules, explaining that its "primary motivation" was to "craft a public campaign finance system that remains within the enabling statute's limit of a $100 million annual cost," and that it also wanted to ensure that ballots were "simpler in appearance." Hallak Decl. Ex. A at 14.

officers," *N.Y. State Corr. Officers & Police Benevolent Ass'n v. New York*, 911 F. Supp. 2d 111,

126 n.4 (N.D.N.Y. 2012) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)).

Thus, the Eleventh Amendment prevents federal courts "from compelling the State to abide by its

own laws." *Boyland*, 487 F. Supp. 2d at 183. Plaintiffs' state-law claims are barred by the Eleventh

Amendment and should be dismissed.

## CONCLUSION

Defendants respectfully request that the Court grant their motions for summary judgment,

dismiss Plaintiffs' complaints with prejudice, and grant such other and further relief as the Court

deems just and proper.

Dated: April 9, 2021                                            Respectfully submitted,

**HARRIS BEACH PLLC**

*/s/ Elliot A. Hallak*
Elliot A. Hallak
Daniel R. LeCours
677 Broadway, Suite 1101
Albany, New York 12207
T: 518.427.9700
F: 518.427.0235
ehallak@harrisbeach.com
dlecours@harrisbeach.com

Thomas J. Garry
333 Earle Ovington Boulevard, Suite 901
Uniondale, New York 11553
T: 516.880.8484
F: 516.880.8483
tgarry@harrisbeach.com

Kyle D. Gooch
99 Garnsey Road
Pittsford, New York 14534
T: 585.419.8800
F: 585.419.8801
kgooch@harrisbeach.com

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to part II.D of this Court's individual practices, I certify that this memorandum of law (i) contains 6,965 words, excluding the cover page, tables, and signature block, as reported by the word-count feature of Microsoft Word; and (ii) complies with the Court's formatting rules.

Dated: April 9, 2021

*/s/ Elliot A. Hallak*
Elliot A. Hallak
