UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-13-2021

LIBERTARIAN PARTY OF NEW YORK, ET
AL.,

                    Plaintiffs,

        - against -

NEW YORK BOARD OF ELECTIONS, ET AL.,

                    Defendants.

20-cv-5820 (JGK)

OPINION AND ORDER

**JOHN G. KOELTL, District Judge:**

The Libertarian Party of New York (the "Libertarian Party")
and the Green Party of New York (the "Green Party"), together
with individual members, have sued the New York Board of
Elections (the "NYBOE"), and its chairs, commissioners, and
executive directors (together, the "NYBOE Defendants"), alleging
that the amendments to the New York Election Law found in
Sections 9 and 10 of Part ZZZ of the 2020-2021 Fiscal Year New
York State Budget Bill ("Part ZZZ"), violate the plaintiffs'
First and Fourteenth Amendment rights. Section 10 of Part ZZZ
amended the overall number of votes required for a political
organization to qualify as a "party" and the frequency with
which parties must requalify ("Party Qualification
Requirement").  Section 9 of Part ZZZ increased the number of
signatures required for a candidate to gain access to the ballot
by an independent nominating petition ("Petition Requirement").

As amended, the New York Election Law now requires that a
political organization's chosen candidate must receive the

1

greater of 130,000 votes or 2 percent of votes cast in the previous presidential or gubernatorial election, whichever is more recent, to qualify as a recognized party. Because the respective presidential candidates of the Libertarian Party and the Green Party both failed to achieve the required vote threshold in the 2020 presidential election, both have been decertified as recognized political parties by the NYBOE. Thus, to gain access to the ballot in 2022, candidates from the Libertarian Party and the Green Party must file independent nominating petitions. For gubernatorial candidates, such nominating petitions must be submitted with signatures from 1 percent of the number of votes cast in the last gubernatorial election (up to 45,000), and at least 1 percent of such enrolled voters (up to 500) must reside in each of one-half of New York's 27 congressional districts.

The plaintiffs have moved for a preliminary injunction to require the NYBOE to reinstate the Libertarian Party and the Green Party as recognized parties for the 2022 gubernatorial election, and to enjoin the NYBOE Defendants from continuing to implement Sections 9 and 10 of Part ZZZ. Because the plaintiffs have failed to demonstrate that the challenged amendments violate their Constitutional rights, otherwise cause irreparable harm to the plaintiffs absent relief at this time, or be against the public interest, their motions are **denied.**

## I.

The plaintiffs have challenged Sections 9 and 10 of Part ZZZ, and thus, this case involves substantially similar facts to those at issue in SAM Party v. Kosinski, 483 F. Supp. 3d 245 (S.D.N.Y. 2020), aff'd sub nom. SAM Party of New York v. Kosinski, 987 F.3d 267 (2d Cir. 2021).[1]

### A.

Under the New York Election Law, a political organization that supports candidates for public office can be designated either as a "party" or an "independent body." N.Y. Elec. Law §§ 1-104(3), (12). Following the challenged amendments contained within Section 10 of Part ZZZ, that took effect on April 3, 2020, a political organization's candidate for governor or president must have received the greater of 130,000 votes, or 2 percent of the total votes cast, in the most recent presidential or gubernatorial election for that organization to qualify as a recognized "party." N.Y. Elec. Law § 1-104(3). A political organization that fails to satisfy such requirements is an "independent body." N.Y. Elec. Law § 1-104(12).

Recognized parties enjoy certain practical benefits that independent bodies do not, such as the authority to maintain a segregated financial account, to which ordinary contributions

---

[1]  Unless otherwise noted, this Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

limits do not apply, for certain expenditures. N.Y. Elec. Law §
14-124(3). Registered parties also appear on voter-registration
forms so that voters can register as party members, N.Y. Elec.
Law §§ 5-210(5)(k)(x), 5-300, enabling parties greater ease in
connecting with potential supporters. Compl. ¶ 25. And, as
particularly relevant for this case, each recognized party
receives a "berthing" for the winner of the party's nomination
process on general election ballots for certain state-wide
elections. Brehm Decl. ¶ 5; N.Y. Elec. Law §§ 6-102, 6-104, 6-
106, 6-114.[2]

By contrast, independent bodies are not provided with a
guaranteed ballot "berth" and must nominate candidates directly
onto the general election ballot, by submitting independent
nominating petitions. N.Y. Elec. Law § 6-142. The candidates of
independent bodies appear with their political organization's
name and emblem on the nominating petition, and, if successful
in satisfying the Petition Requirement, on the ballot. N.Y.
Elec. Law § 6-138(2)-(3); Compl. ¶ 26. Following the challenged
amendments in Section 9 of Part ZZZ, nominating petitions for
statewide office must be signed by the lesser of 45,000
registered voters or 1 percent of the votes cast in the last

---

[2]  Parties are also subject to various regulatory requirements, such as
maintaining certain governing committees and submitting certain required
filings. See, e.g., N.Y. Elec. Law §§ 2-102, 2-104, 2-106, 2-112, 2-114.
Further, the internal party primary process is governed by certain
requirements. See, e.g., N.Y. Elec. Law §§ 6-104, 6-110, 6-118, 6-136.

gubernatorial election. N.Y. Elec. Law § 6-142. The signatures
are required to be from registered voters who have not yet
signed a different petition for the same office. N.Y. Elec. Law
§ 6-138(1). In addition, of the required signatures, at least
500 (or 1 percent of enrolled voters, whichever is less) must be
from signatories residing in each of one-half of the State's 27
congressional districts. N.Y. Elec. Law § 6-142(1). Finally, the
petition can only be circulated during a specific, prescribed 6-
week period. N.Y. Elec. Law § 6-138(4).

For 85 years, New York conferred recognized "party" status
on any political organization whose candidate in the prior
gubernatorial election received at least 50,000 votes.
Declaration of Elliot A. Hallak, ECF No. 52 ("Hallak Decl."),
Ex. D ¶ 12. Similarly, the number of signatures required for
independent nominating petitions was set in 1911 at 6,000, which
was then raised in 1922 at 15,000, and then raised again in 1971
to 20,000, before being lowered, in 1992, to 15,000. Declaration
of Robert A. Brehm, ECF No. 51 ("Brehm Decl.") ¶¶ 66.[3] The 6-
week or 42-day collection period for signatures was adopted in
1946. 1946 N.Y. Sess. Laws, Ch. 17, § 137(4).

---

[3] In 1922, in addition to raising the Petition Requirement from 6,000 to
15,000, the New York State Legislature set the required vote threshold to
maintain party status at 25,000 votes. Brehm Decl. ¶¶ 31, 61. Although the
party requirement was then raised again to 50,000 in 1935, the Petition
Requirement remained the same until 1971. Id. ¶¶ 31, 66.

The amended Party Qualification Requirement and Petition Requirement that the plaintiffs challenge developed from the recommendations of a special commission, established to design a public campaign finance system for New York State and recommend electoral reforms. Part XXX of the 2020 Fiscal Year Enacted Budget created the New York State Campaign Finance Review Commission (the "Commission") as a "public campaign financing and election commission to examine, evaluate and make recommendations for new laws." 2019 N.Y. Sess. Laws, Ch. 59, Part XXX, § 1(a). Part XXX instructed the Commission to make its recommendations "in furtherance of the goals of incentivizing candidates to solicit small contributions, reducing the pressure on candidates to spend inordinate amounts of time raising large contributions for their campaigns, and encouraging qualified candidates to run for office." Id.

The Commission was also instructed to "determine and identify new election laws" relating to, among other things, "rules and definitions governing: candidates' eligibility for public financing; party qualifications; multiple party candidate nominations and/or designations . . . " Id. § 2(j). In addition, Section 3 of Part XXX required that the Commission design the public campaign finance system such that it could be administered with costs under $100 million annually. 2019 N.Y. Sess. Laws Ch. 59, Part XXX § 3. Part XXX required the

6

Commission to submit its report by December 1, 2019 and stated that its recommendation "shall have the full effect of law unless modified or abrogated by statute prior to December 22, 2019. 2019 N.Y. Sess. Laws Ch. 59, Part XXX § 1.

The Commission's Report to the Governor and the Legislature (hereafter, the "Report") included a series of recommendations to, among other things, establish a voluntary public campaign finance system with matching of small-dollar donations up to certain caps for candidates for state office in primary and general elections. Declaration of Michael Kuzma, ECF No. 46-5 ("Kuzma Decl.") Ex. D.

At issue here, the Commission also recommended changing the Party Qualification Requirement's vote threshold to 2 percent of the total votes cast for a party's candidate in the previous gubernatorial or presidential race, or 130,000 votes, whichever is greater. The Commission explained that it made this recommendation because, among other reasons, the "ability of a party to demonstrate bona fide interest from the electorate is paramount in ensuring the success of a public campaign finance system," and that "setting a rational threshold for party ballot access, based on a demonstration of credible levels of support from voters in this state, helps to ensure that the political parties whose candidates will draw down on public funds under the public matching program reflect the novel and distinct

ideological identities of the electorate of New Yorkers who
ultimately fund this public campaign finance program." Kuzma
Decl. Ex. D, at 28; Compl. ¶ 106.   The Commission noted its
belief that raising the Party Qualification Requirement's
threshold to a level that "retained a measure of
proportionality" would "actually increase voter participation
and voter choice, since voters will now be less confused by
complicated ballots with multiple lines for parties that may not
have any unique ideological stances," and that the higher
thresholds will enable voters to "make more resolute choices
between candidates" because they can "rely upon the knowledge
that such parties have sufficient popular support from the
electorate of this state." Report at 14-15. The Commission also
noted the changes to the Party Qualification Requirement were
also important for "craft[ing] a public campaign finance system
that remains within the enabling statute's limitation of $100
million annual cost." Id. at 14.

The Commission detailed in its Report that in seeking to
arrive at a "rational" threshold, it considered New York's
historical experience, as well as the party qualification
criteria and nominating petition thresholds from other states.
Report at 41-47. The Commission considered the frequency with
which other states required parties to requalify, the number of
votes required to requalify, whether qualification thresholds

were made in reference to presidential and/or gubernatorial elections, whether states had public campaign finance systems, and whether states permitted fusion voting. Id. Minutes from the Commissions' meetings and statements from the individual Commissioners, included as part of the Report, reveal that a proposal of a 3 percent vote threshold for the Party Qualification Requirement was considered and rejected, that the appropriate threshold was actively debated, and that the 2 percent vote threshold was a compromise based upon the information considered and competing policy views. See, e.g., Report at 48 (Statement of Commissioner Kimberly A. Galvin), 52 (Statement of Commissioner Denora Getachew), 62–64 (Statement of Commissioner Jay Jacobs), 67 (Statement of Commissioner John M. Nonna), 81 (Statement of Commissioner David C. Previte), and 133 (Minutes from November 25 Meeting at Westchester Community College).

As a "corollary" to the recommended changes to the Party Qualification Requirement, the Committee also recommended increasing the number of signatures required for independent nominating petitions, used by a candidate supported by independent bodies or otherwise unaffiliated with a party to access the general election ballot. Report, at 15. From 1922 to November 2020, New York experienced over a four-fold increase in the number of enrolled voters. Brehm Decl. ¶ 67. The

Commission's recommendation of 45,000 signatures amounts to 0.74 percent of the voters who voted in the 2018 New York gubernatorial election and only 0.33 percent of New York's 13.55 million registered voters. Brehm Decl. Exs. A, B.

The Commission issued its Report on December 1, 2019. Because the New York State Legislature did not pass any statutes modifying or abrogating the Commission's recommendations, the recommendations putatively acquired the "full effect of law" by December 22, 2019, and the relevant amendments to the party qualification requirements took effect on January 1, 2020. In an unrelated proceeding, a group of plaintiffs challenged the Commission and its Report in New York state court. On March 12, 2020, the New York State Supreme Court ruled that the New York State Legislature improperly delegated legislative authority to the Commission, and as a result the Commission's recommendations did not have the force of law. Compl. ¶ 48.

In response, Part ZZZ was added to the 2020-2021 Fiscal Year New York State Budget Bill, which the New York State Legislature passed, and Governor Cuomo signed into law on April 3, 2020. Compl. ¶ 72. Part ZZZ amended the New York Election Law to enact the recommendations of the Commission, including an amendment to Section 1-104(3) to modify the definition of "party" to include the new Party Qualification Requirement and

an amendments to Section 6-142(1) to include the amended Petition Requirement. 2020 N.Y. Sess. Laws Ch. 58, Part ZZZ.

B.

The Libertarian Party is the New York State "affiliate" of the national Libertarian Party, which the plaintiffs allege is the third-largest political party in the United States. Compl. ¶ 7. Anthony D'Orazio is the Chair of the New York State Libertarian Party, and Larry Sharpe was the Libertarian Party candidate for governor in 2018. Compl. ¶¶ 8-9. From 1972 until 2018, the Libertarian Party operated as an independent body, under N.Y. Election Law § 1-104(12). Id. ¶ 7. Since 1974, the Libertarian Party successfully obtained a place for its chosen candidates on the ballot through the independent nominating petition process, with the exception of 1986. Id.

The Green Party of New York was formed in 1992, and is affiliated with the Green Party of the United States, which the plaintiffs assert is the fourth-largest political party in the country. Id. ¶ 11. The Green Party first became a recognized party in New York in 1998, but lost the status as a result of its gubernatorial candidate's performance in the 2002 election. Id. However, the Green Party regained party status in 2010 and requalified under the previous party qualification requirements in 2014 and 2018. Id. Gloria Mattera and Peter LaVenia are the co-chairs of the New York State Green Party. Id. ¶¶ 12-13.

In the November 2020 election, the presidential candidates from the Green Party and Libertarian Party received 32,753 and 60,234 votes, or 0.38 percent and 0.70 percent of total votes cast, respectively. Brehm Decl. ¶¶ 21, 28; Ex. A. Because both parties thus failed to meet the amended Party Qualification Requirement, both parties were "decertified" by the NYBOE. Declaration of William Anderson, ECF No. 46-2 ("Anderson Decl.") ¶¶ 3, 5.

Mark Axinn, a former Libertarian Party Chairman, has represented that the Libertarian Party has historically relied on paid petition gatherers to collect independent nominating petition signatures. Declaration of Mark Axinn, ("Axinn Decl.") ¶¶ 4-6. For example, in 2016 and 2018, the Libertarian Party "expended approximately $70,000 to obtain approximately 20,000 ballot signatures," using paid petitioners. Id. ¶ 8. Axinn estimates that it would cost the Libertarian Party "at least $157,000" to gather 45,000 signatures, which Axinn represents "the [Libertarian] Party does not have." Id. ¶ 8.

Howie Hawkins, the Green Party's candidate in the 2020 November presidential elections has represented that the Green Party also has relied on paid petition canvassers and that "[p]rofessional petition firms have tended to charge roughly $3 per signature," although this amount has increased recently because of COVID-19. Declaration of Howie Hawkins, ECF No. 46-3

("Hawkins Decl.") ¶¶ 6-7. Hawkins explained that the Green Party has thought it necessary to collect as many as twice the required number of signatures for petitions, because signatures can be rejected for several reasons including the failure of the petitioner to fill out witness statements correctly, or to include certain details (such as, the signatory's congressional district). Id. ¶¶ 4, 14. Hawkins estimates that it would cost the Green Party $270,000 to gather 90,000 signatures—the level that Hawkins believes to be necessary to provide an appropriate safety margin for rejected signatures. Id. ¶ 9. Hawkins acknowledged that "the best petitioners have been able to achieve an average of 10-20 signatures per hour." Id. ¶ 12. Gloria Mattera, current Co-Chair of the Green Party has stated that it is her opinion that it would be "nearly impossible for the Green Party to qualify candidates for statewide and federal office" with the new petitioning requirements. Declaration of Gloria Mattera, ECF No. 46-4 ¶ 12.

## C.

The plaintiffs filed their complaint on July 27, 2020, alleging violations of the plaintiffs' rights to speak and associate guaranteed by the First and Fourteenth Amendment (Count I), as well as rights guaranteed by the Equal Protection Clause (Count II) and Due Process Clause of the Fourteenth Amendment (Counts III and IV), and Article VII of the New York

Constitution (Count V). The defendants filed their Answer on August 18, 2020. In the interim, on September 1, 2020, this Court denied a motion for preliminary injunction filed by the Serve American Party of New York ("SAM Party"), the Working Families Party ("WFP"), and their supporters, seeking to enjoin Sections 9 and 10 of Part ZZZ, in two related cases, SAM Party v. Kosinski, 483 F. Supp. 3d 245 (S.D.N.Y. 2020), aff'd sub nom. SAM Party of New York v. Kosinski, 987 F.3d 267 (2d Cir. 2021). On December 29, 2020, the plaintiffs filed their motion for a preliminary injunction based on Counts I-IV. Kuzma Decl. ¶ 2. While the parties briefed the present motion for a preliminary injunction, the Court of Appeals affirmed this Court's denial of the SAM Party plaintiffs' motion for a preliminary injunction. SAM Party, 987 F.3d at 267.

## II.

The plaintiffs have sought to enjoin the NYBOE from implementing the Party Qualification Requirement, by requiring that the Green Party and the Libertarian Party be reinstated as recognized parties, despite their 2020 presidential election performance. In addition, the plaintiffs have sought to enjoin the NYBOE from implementing the increased Petition Requirement for statewide elections for the 2022 election.

"To obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant has to

demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction," and (4) "that the balance of equities tips in [the movant's] favor." Libertarian Party of Conn. v. Lamont, 977 F.3d 173, 176 (2d Cir. 2020).[4]

As explained below, the plaintiffs have failed to demonstrate that they are likely to succeed on the merits of any of their claims, that they will suffer irreparable harm without an injunction, or that the public interest or balance of equities weigh in their favor.

## A.

"The Constitution provides that States may prescribe 'the Times, Places and Manner of holding Elections for Senators and Representatives,'" and courts have recognized "that States retain the power to regulate their own elections." Burdick v. Takushi, 504 U.S. 428, 433 (1992) (quoting U.S. Const. Art. I, § 4, cl. 1). Although the "First Amendment protects the rights of citizens to associate and form political parties for the

---

[4] In the Second Circuit, when seeking an injunction that is "mandatory" (one that changes the status quo) a moving party is held to a heightened standard, and "a district court may enter a mandatory preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits." Libertarian Party of Conn., 977 F.3d at 176–77. The plaintiffs argue that their request is one for a "prohibitory injunction," that would not trigger the increased burden. It is unnecessary to decide whether the heightened standard applies, because the plaintiffs have failed to satisfy even the lesser standard.

advancement of common political goals and ideas," states are permitted to, "and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election-and campaign-related disorder." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 357-58 (1997). Because every election law "inevitably affects" individual voters' rights to vote and to associate with others for political ends, Burdick, 504 U.S. at 433, courts do not subject every election law or regulation to "strict scrutiny," nor "require that [each] regulation be narrowly tailored to advance a compelling state interest." Id.

Instead, courts evaluate challenges to state action restricting ballot access under the Anderson-Burdick framework, and vary the level of scrutiny applied depending on the burden that the state law imposes on First and Fourteenth Amendment rights. Libertarian Party of Conn., 977 F.3d at 177. See Burdick, 504 U.S. 428, 434 (1992) (quoting Anderson v. Celebrezze, 460 U.S. 780, 788 (1983)). When a challenged state election regulation imposes "severe restrictions on First and Fourteenth Amendment rights," it "must be narrowly drawn to advance a state interest of compelling importance." Burdick, 504 U.S. at 434 (quoting Norman v. Reed, 502 U.S. 279, 289 (1992)). However, "when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important

regulatory interests are generally sufficient to justify the restrictions." Id. In such cases, a court "must weigh the State's justification against the burden imposed," but such review is "quite deferential" and does not require "elaborate empirical verification of the weightiness of the State's asserted justifications." Libertarian Party of Conn., 977 F.3d at 177; see also Timmons, 520 U.S. at 364.

While restrictions placed on a political party implicate the First Amendment rights of its supporters, Anderson, 460 U.S. at 786, political parties themselves "have no constitutional right to appear on a ballot." Person v. New York State Bd. of Elections, 467 F.3d 141, 144 (2d Cir. 2006) (citing Prestia v. O'Connor, 178 F.3d 86, 88-89 (2d Cir. 1999)). "Ballots serve primarily to elect candidates, not as forums for political expression," and thus parties and their supporters do not have a specific "right to use the ballot itself to send a particularized message." Timmons, 520 U.S. at 363. Accordingly, "States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office." Munro v. Social Workers Party, 479 U.S. 189, 193 (1986); see also Prestia, 178 F.3d at 88.

The plaintiffs have argued that, as amended, the New York Election Law's Party Qualification Requirement and Petition

Requirement are unconstitutional, both facially and as applied to them. The plaintiffs argue that both the Party Qualification Requirement and the Petition Requirement impose a "severe burden" upon the rights of the Libertarian Party, the Green Party, and their supporters, and that such provisions are not sufficiently related to legitimate state interests to justify the restrictions under any level of scrutiny.

However, the burdens placed on the rights of the Libertarian Party, the Green Party, and their supporters by the Party Qualification Requirement and the Petition Requirement are not severe. Further, the New York State Legislature enacted Sections 9 and 10 of Part ZZZ, consistent with the recommendations of the Commission, to advance valid, important regulatory interests, and such interests are of sufficient weight to warrant the limitations placed upon the plaintiffs. The Party Qualification Requirement and Petition Requirement are reasonable, nondiscriminatory policy choices to advance valid State regulatory interests, within the boundaries that the First and Fourteenth Amendments prescribe. Accordingly, the plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their claims.

1.

To determine whether a challenged provision places a "severe burden" on a plaintiff's First and Fourteenth Amendment

rights, courts in this Circuit are instructed to "consider the alleged burden imposed by the challenged provision in light of the state's overall election scheme." Schulz v. Williams, 44 F.3d 48, 56 (2d Cir. 1994). As the Second Circuit Court of Appeals has recently instructed, "the hallmark of a severe burden is exclusion or virtual exclusion from the ballot." Libertarian Party of Conn., 977 F.3d at 177 (quoting Libertarian Party of Kentucky v. Grimes, 835 F.3d 570, 574 (6th Cir. 2016)). Moreover, "[w]hat is ultimately important is not the absolute or relative number of signatures required but whether a reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." Id. at 177-78. The concern is to ensure that such reasonably diligent candidates retain means for seizing upon the "availability of political opportunity." Munro, 479 U.S. at 199.

The plaintiffs argue that the Party Qualification Requirement and Petition Requirement – both separately and in conjunction – pose severe burdens by making the process for accessing the general election ballot significantly more difficult for the chosen candidates of the Libertarian Party and the Green Party for state-wide office. However, those arguments are unpersuasive.

First, with respect to the Party Qualification Requirement, for the same reasons that this Court denied the SAM Party's

preliminary injunction motion, which the Court of Appeals affirmed, and denied a similar preliminary injunction motion by the WFP, the Party Qualification Requirement does not impose a "severe burden." See SAM Party, 987 F.3d at 276. The Party Qualification Requirement did not prevent the WFP and Conservative Party from requalifying as parties, in addition to the Democratic and Republican parties, as a result of the 2020 presidential election.  And, the Libertarian Party and the Green Party only failed to requalify as parties because they obtained only 60,234 votes and 32,753 votes (or 0.70 percent and 0.38 percent of the total votes cast), respectively. Brehm Decl. ¶¶ 21, 28. There is no authority for the proposition that a state is required to requalify a party that has garnered such low levels of support. Indeed, courts have upheld ballot access provisions requiring demonstrations of a much higher "modicum of support" than the quantum the amended New York Election Law requires.[5]  Further, the plaintiffs have not identified any

---

[5]  Unlike the SAM Party plaintiffs, the Libertarian Party and the Green Party have not seriously argued that the use of votes collected in presidential elections as a reference is a severe burden—possibly because both parties have historically run candidates in presidential elections. Nevertheless, as the Court of Appeals found in SAM Party, and all Circuit Courts of Appeal that have addressed the issue on the merits have found, the decision to consider the number of votes a political organization's candidate receives in the presidential election does not alter the constitutional analysis or impose a "severe burden." See SAM Party, 987 F.3d at 275-76; Libertarian Party of Ky. v. Grimes, 835 F.3d 570, 575 (6th Cir. 2016); Green Party of Ark. v. Martin 649 F.3d 675, 683-84 (8th Cir. 2011); Aruntunoff v. Okla. State Election Bd., 687 F.2d 1375, 1379 (10th Cir. 1982). Further, the Green Party's challenge to the Party Qualification Requirement's quantum of required votes is especially unpersuasive because the Green Party's presidential candidate received only 32,753 votes (0.38 percent) in the

authority to support the proposition that shifting the qualifications from quadrennial to biennial is itself a severe burden.

The plaintiffs attempt to distinguish the decisions by this Court and the Court of Appeals in SAM Party by arguing that as "non-fusion parties" (parties that will not cross-nominate candidates from other parties), both plaintiffs face uniquely severe burdens, that the plaintiffs in SAM Party and WFP did not. The plaintiffs point to data suggesting that such "non-fusion" parties have typically garnered fewer votes than "fusion" party candidates in New York state-wide elections, and, at oral argument, the plaintiffs suggested that "fusion" parties are "not germane" to the analysis of the burden the amended Party Qualification Requirement places on minor parties. Tr. at 17. That argument is unpersuasive.

As a preliminary note, this distinction is mistaken, because the SAM Party did nominate its own candidates, including its own gubernatorial ticket of Stephanie Miner and Michael Volpe, in the gubernatorial 2018 election. SAM Party, 987 F.3d at 272.[6] Further, the New York Election Law does not draw a distinction between "fusion" or "non-fusion" parties, nor

November 2020 election, which means that the Green Party would have failed to requalify even under the previous 50,000 vote threshold. Brehm Decl. ¶ 21.
[6] Further, the Libertarian Party appears to have nominated a combination of Libertarian Party and cross-endorsed candidates in 2020. Anderson Decl. ¶ 23.

require a party that has previously chosen to cross-nominate candidates to continue to do so. Historical data suggest that on several occasions "non-fusion" parties have received 2 percent of the total votes, including the Independence Party that received votes exceeding the current threshold in back-to-back races in 1996 and 1998. Brehm Decl. Ex. A. Such historical evidence belies the plaintiffs' suggestion that the Party Qualification Requirement would result in "virtual exclusion" from the ballot for non-fusion parties.

Moreover, the independent nominating petition is a viable means for candidates to obtain ballot access and the recently-enacted Petition Requirement has not foreclosed that avenue of ballot access. It is uncontested that other courts have upheld required levels of demonstrated support in other cases well above the number of signatures required by the Petition Requirement—1 percent of the number of votes cast in the last gubernatorial election (up to 45,000 votes).

In Jenness v. Fortson, the Supreme Court upheld a Georgia election law that required a political organization's candidate to receive 20 percent or more of the votes in the most recent gubernatorial or presidential election to be a recognized "political party," and required all other political organizations to secure the signatures of 5 percent of the voters in the state to place their candidates on the ballot. 403

U.S. 431, 434, 439-440 (1971). In Prestia v. O'Connor, the Second Circuit Court of Appeals interpreted Jenness and its progeny to establish that "a requirement that ballot access petitions be signed by at least 5 [percent] of the relevant voter pool is generally valid, despite any burden on voter choice that results when such a petition is unable to meet the requirement." 178 F.3d at 88. See also Rainbow Coal. of Okla. v. Okla. State Election Bd., 844 F.2d 740, 743 (10th Cir. 1988) (relying on Jenness and stating that a requirement for minor parties to obtain a number of voter signatures equal to 5 percent of the votes cast in the last presidential or gubernatorial election is "undeniably constitutional").

Moreover, the Court of Appeals in SAM Party already considered the "combined effect of New York's ballot-access restrictions," including the potential for smaller political organizations in New York to "compete as an independent body," and found that independent nominating petitions remain an available, "alternative means for political organizations to complete in elections." 987 F.3d at 275-76. The Court of Appeals concluded that, because "[t]he signature requirements set by the State of New York are significantly lower than [those at issue in Jenness], and a reasonably diligent organization could be expected to satisfy New York's signature requirement," the Petition Requirement does not impose a "severe burden." Id.; see

also LaRouche v. Kezer, 990 F.2d 36, 40 (2d Cir. 1993) (concluding that facially a primary ballot petition requirement of "signatures from only one percent of the party's registered voters . . . is not a severe burden and has even been characterized as lenient in similar contexts").[7] Indeed, it appears undisputed that various other states have both higher overall required number of signatures per petition and number of signatures required as a percentage of the eligible signatories. Hallak Decl. Exs. B, C.

The plaintiffs have attempted to distinguish this reasoning by arguing that the 42-day period within which the signatures for nominating petitions must be gathered results in a necessary "signature-per-day" rate that is too high.

The plaintiffs have failed to sustain their burden of demonstrating a likelihood of success on the merits. The plaintiffs' argument that the Supreme Court in Jenness, the Court of Appeals in Prestia, and other courts have failed to consider the timing within which signatures must be gathered is unpersuasive. Litigants have previously raised the argument that

---

[7] While "[c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any litmus-paper test that will separate valid from invalid restrictions," and instead must be analyzed based on how such laws actually function, Anderson, 460 U.S. at 789, the Court of Appeals did consider the specific burdens of New York's amended Petition Requirement, when it concluded in SAM Party that "a reasonably diligent organization could be expected to satisfy New York's signature requirement." 987 F.3d at 276.

a "signature-per-day" requirement is too onerous without success. For example, in American Party of Texas v. White, 415 U.S. 767 (1974), the plaintiffs sought to challenge a Texas law requiring nominating petitions to contain signatures obtained over a 55-day period from 1 percent of the voters in the last gubernatorial election. Rejecting the challenge, the Supreme Court noted that the threshold could be met with 100 canvassers collecting an average of 4 signatures a day and that it was "unimpressed" with the plaintiffs' argument because "[h]ard work and sacrifice by dedicated volunteers are the lifeblood of any political organization." Id. at 787.[8] Similarly, in Storer v. Brown, 415 U.S. 724, 740 (1974), the Supreme Court considered the constitutionality of a California requirement that candidates for President and Vice President "gather[] 325,000 signatures in 24 days," equivalent to 5 percent of the votes cast the prior general election. The election law also required that signatures must come from voters who had not previously voted in a primary—thus further shrinking the pool of available voters. Although the Court remanded the case for a determination of whether the law posed a "severe burden" as applied, the Court rejected the facial challenge noting "[s]tanding alone,

---

[8]  The Supreme Court also noted that "some cut off period" for circulating nominating petitions "is necessary for the Secretary of State to verify the validity of signatures on the petitions, to print the ballots, and, if necessary, to litigate any challenges." Id. at 787 n.18.

gathering 325,000 signatures in 24 days would not appear to be an impossible burden." Id. The Storer court noted that although the law required gathering signatures at a rate of 13,542 per day, such a threshold could be accomplished "with 1,000 canvassers" gathering 14 signatures per day which "would not appear to require an impractical undertaking for one who desires to be a candidate for President." Id.[9]

The plaintiffs have failed to establish that the level at which the New York State Legislature has set the petition requirement is beyond the capabilities of a "reasonably diligent candidate" or party. Gathering 45,000 signatures (a level set at 0.33 percent of the total registered voters in the state) in 42 days would require a candidate to gather 1,071 signatures per day, a figure representing approximately 0.008 percent of the state's population of registered voters. If, as the Supreme Court assumed in Storer, a reasonably diligent candidate could rely on canvassers gathering signatures at a rate of 14 per day, over 42 days, this could be accomplished with 77 canvassers. Or,

---

[9]  In Storer, the Supreme Court remanded the case because it was unclear how California's exclusion of voters who had already voted in a primary for the same elected office from those eligible to sign a nominating petition for the general election would reduce the pool of voters eligible to sign a nominating petition. 415 U.S. at 740.  In this case, the plaintiffs have made no effort to show that the exclusion of voters who have already signed a nominating petition for the same elected office would meaningfully reduce the pool of eligible voters, and the defendants have maintained that the exclusion would be insignificant, particularly in view of the fact that nominating petitions require the signatures of 45,000 votes out of a total of over 13.55 million eligible voters. Tr. at 34; Brehm Decl. Ex. B.

put differently, 1,000 canvassers, gathering 14 signatures a day (as in Storer) could gather the requisite number of signatures in 4 days. See LaRouche, 990 F.2d at 40-41 (Connecticut party primary ballot petitioning requirement that a candidate must obtain 1 percent of the party's registered voters in a 14 day period is constitutional).

The plaintiff's declarations do not establish that the requirement at issue is beyond the level that a "reasonably diligent candidate could be expected to be able to meet," Libertarian Party of Conn., 977 F.3d at 178, or that it would cut off the "availability of political opportunity." Munro, 479 U.S. at 199. According to the former Green Party 2020 presidential candidate, the "best petitioners have been able to achieve an average of 10-20 signatures per hour." Hawkins Decl. ¶ 12. (This would be a significantly higher yield than the Storer court's estimated 14 signatures per day.)

Representatives from both parties have stated that the Green Party and the Libertarian Party lack sufficient volunteers to gather signatures, and thus must hire paid canvassers, which can be costly and divert from other uses of campaign funds. Such statements emphasize that it will take "hard work and sacrifice by dedicated volunteers" for the Green Party and the Libertarian Party either to increase the number of volunteer canvassers or to raise more funds to pay professional canvassers, but such

work and sacrifice "are the lifeblood of any political
organization." White, 415 U.S. at 787. Such potential need for
more volunteers or incurred costs—particularly at the levels
that the plaintiffs estimate—"do not constitute exclusion or
virtual exclusion from the ballot." Grimes, 835 F.3d at 575.[10]

Thus, considering the Party Qualification Requirement and
the Petition Requirement together—as this Court and the Court of

---

[10]  The plaintiffs seek to rely on Rockefeller v. Powers, 78 F.3d 44, 45 (2d
Cir. 1996), in which the Court of Appeals found a signature requirement to be
a severe burden because of inclement weather, short periods of daylight, and
holidays during a 37-day period for gathering signatures, and certain
technical requirements, that required parties to gather far more signatures
than the stated requirement. The order in Rockefeller was "rendered with
considerably less elaboration" than usual, because the appeal was handled on
a rapid, expedited basis, because the Republican primary candidate in
question had made diligent efforts to achieve primary ballot access, had
failed, and the district court had ordered the plaintiff be included on the
primary ballot. Id. Subsequently, the Court of Appeals in Prestia clarified
that Rockefeller "was based on—and therefore limited to—the special
circumstances of that case." Prestia, 178 F.3d at 87. Such "specific
circumstances" are not present in this case, nor is there such a clear record
of burden.
    Finally, New York's historic experience of having comparatively many
smaller parties and candidates nominated by independent bodies on the ballot
stands in contrast to the experience of Michigan, and thus the plaintiffs'
reliance on Graveline v. Benson, 992 F.3d 524, 539 (6th Cir. 2021) is
misplaced.  In Graveline, the Sixth Circuit Court of Appeals noted that after
the relevant Michigan law's "implementation in 1988, no independent candidate
for statewide office has managed to complete a qualifying petition," despite
the fact that "since 1997, at least thirty candidates have formed the
required committees to begin collecting signatures to qualify for the ballot
as an independent candidate for statewide office." Id. at 539. In this case,
New York does not have an election system that has proven to be so starkly
inhospitable to independent and minor party candidates over a similar period.
See Brehm Decl. ¶ 69. And under the current Party Qualification Requirement,
the WFP and the Conservative Party continue to qualify as parties.  Further,
if the current Party Qualification Requirement threshold had applied to prior
elections, several minor candidates historically would have achieved the
required number of votes to have their parties recertified, such as the Ralph
Nader for the Green Party in the 2000 presidential election, Howie Hawkins
for the Green Party in the 2014 gubernatorial election, or the Independence
Party's candidates for President and Governor in 1996 and 1998. Brehm Decl.
Ex. A.

Appeals did in SAM Party, the plaintiffs have failed to
demonstrate that either – standing alone or taken together –
amounts to a "severe burden" requiring the application of strict
scrutiny.[11]

## 2.

Because neither the Party Qualification Requirement nor the
Petition Requirement places "severe" burdens on the First and
Fourteenth Amendment rights of the plaintiffs, New York's
asserted regulatory interests "need only be sufficiently weighty
to justify the limitation imposed on the [plaintiffs'] rights."
Timmons, 520 U.S. at 364; see also Burdick, 504 U.S. at 434. New

---

[11] In their papers, the plaintiffs take issue with the requirement under
Section 6-140(1)(b) of the New York Election Law that petition signatures
must be witnessed by a New York voter. The plaintiffs argue that it is
"unconstitutional" citing to Free Libertarian Party, Inc. v. Spano, 314 F.
Supp. 3d 444, 461 (E.D.N.Y. 2018). But the order in that case was vacated.
See Redpath v. Spano, No. 18-2089, 2020 WL 2747256 (2d Cir. May 7, 2020). And
that statutory provision has been upheld. See Germalic v. Comm'rs State Bd.
of Elections, N.Y., No. 10-cv-1317, 2011 WL 1303644, at *3 (N.D.N.Y. Apr. 1,
2011) (concluding section 6-140(1)(b) was "narrowly drawn to serve the states
compelling interests and provide[d] a reasonable alternative to ease the
burden on [the] plaintiff's First and Fourteenth amendment rights"), aff'd on
other grounds sub nom. Germalic v. New York Bd. of Elections Comm'rs, 466 F.
App'x 54 (2d Cir. 2012). Apart from these passing conclusory comments, the
plaintiffs have not provided any justification or authority to support the
proposition that the requirement for petition witnesses to be New York voters
is unconstitutional. Moreover, at oral argument, the plaintiffs appeared to
concede that they are only challenging the provision "as an as-applied in
combination challenge" and that the case "is certainly not . . . pled" to
demonstrate that section 6-140(1)(b) is independently unconstitutional. Tr.
at 15-16.

In addition, at oral argument, the plaintiffs conceded that they "are not
challenging" and "would not emphasize the distributional requirement" that
500 signatures be obtained from each of New York's congressional districts,"
but rather that the provisions "as applied in combination" impose a severe
burden. Tr. at 12-13. In view of the fact that the majority of New York's
congressional districts are concentrated in the New York City metropolitan
area, canvassers would not be required to fan out throughout the state to
obtain the necessary signatures.

York has offered several important, non-discriminatory regulatory interests to justify both the Party Qualification Requirement and the Petition Requirement.

First, the amended Party Qualification Requirement helps to ensure that candidates appearing on the ballots enjoy a "modicum" of support, thereby assisting in maintaining an organized, uncluttered ballot; preventing voter confusion and frustration; avoiding fraudulent and frivolous candidacies; and assisting the maintenance of an efficient public finance system. See Brehm Decl. ¶¶ 38-50 (discussing ballot complexity and voter confusion), ¶¶ 51-54 (discussing how the amended party qualifications help to ensure public campaign funding does not support frivolous intra-party primary campaigns); ¶¶ 55-58 (discussing administrative costs associated with regulating parties and administering party primaries); Hallak Decl. Ex. D ¶¶ 33-39 (discussing ballot overcrowding and risk of voter confusion); see also Munro, 479 U.S. at 193-94 (affirming the validity of states' interest in avoiding frivolous candidates and ensuring candidates on ballots enjoy a "modicum" of support); Storer, 415 U.S. at 732 (affirming the validity of states' interest in preventing overcrowded ballots and voter confusion); Green Party of Conn. v. Garfield, 616 F.3d 213, 232 (2d Cir. 2010) (affirming the validity of a state's interest in not funding "hopeless" candidates through a public campaign

funding system). The Commission believed "setting a rational threshold for party ballot access, based on a demonstration of credible levels of support from voters in this state, helps to ensure that the political parties whose candidates will draw down on public funds under the public matching program reflect the novel and distinct ideological identities of the electorate of New Yorkers who ultimately fund this public campaign finance system." Report, at 14-15. Similarly, in furtherance of those objectives, the Commission found the Petition Requirement to be an important "corollary" to the amended Party Qualification Requirement. Id. The Commission's Report makes clear that its recommendations, which the New York State Legislature enacted, were in furtherance of these valid interests, and that the Commission sought to tailor its recommendations in reasonable, nondiscriminatory furtherance of those valid interests. Timmons, 520 U.S. at 364 (noting the Burdick-Anderson balancing test does not "require elaborate, empirical verification of the weightiness of the State's asserted justifications"); Munro, 479 U.S. at 194-95 ("We have never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access.").

As this Court and the Court of Appeals concluded in SAM Party, the Party Qualification Requirement is well within the election law requirements upheld in other cases and furthers the reasonable goals of avoiding overcrowded ballots and voter confusion and ensuring that candidates who appear on the ballot enjoy a "modicum of support." SAM Party, 987 F.3d at 277; SAM Party, 483 F. Supp. 3d at 249; see also Jenness, 403 U.S. at 440-41 (upholding a Georgia statute that required organizations have candidates receive 20 percent of the votes in a specified election to qualify for party access, and 5 percent for ballot access); Green Party of Ark. v. Martin, 649 F.3d 675, 683 (8th Cir. 2011) (upholding a requirement for a political party to obtain 3 percent of the vote in the next general election); McGlaughlin v. N.C. Bd. Of Elections, 65 F.3d 1215, 1222 (4th Cir. 1995) (upholding North Carolina election laws requiring a petition containing signatures of 2 percent of votes cast in the past gubernatorial election for a party to gain access to ballot and requiring party's candidate for president or governor to receive 10 percent of votes in the general election for the party to remain on the ballot); Rainbow Coalition, 844 F.2d at 744 (upholding a requirement of 5 percent of the votes cast in the last general election to become a party and concluding that "the five percent requirement itself is undeniably constitutional"); Aruntunoff v. Okla. State Election Board, 687

32

F.2d 1375, 1378-80 (10th Cir. 1982) (upholding an Oklahoma law requiring that a party receive 10 percent of the vote in the last gubernatorial or presidential election to maintain its party status).

Moreover, the Party Qualification Requirement—including the need to requalify biennially—is a reasonable method for measuring whether a party continues to enjoy a sufficient "modicum of support." Courts have regularly recognized the use of popular vote totals in previous elections as an appropriate measure of public support. See, e.g., Jenness, 403 U.S. at 439-440; Green Party of Conn., 616 F.3d at 232 (noting that "popular vote totals in the last election are a proper measure of public support"). Further, as New York's historic experience highlights, the fortunes of minor parties vary dramatically, even across short periods of time. Therefore, the decision to ensure that parties demonstrate a "modicum of support" biennially is a reasonable, nondiscriminatory policy decision in furtherance of valid interests.[12]

---

[12] While the plaintiffs have suggested that various limits on access to New York's public campaign financing, including the $5,000 cap for primary race candidates in smaller party primaries, are sufficient to limit the burdens on the public campaign finance system, the additional limits on hopeless candidates obtaining public funds imposed by the Party Qualification Requirement and Petition Requirement "serve[] the important public interest against providing artificial incentives to splintered parties and unrestrained factionalism." Green Party of Conn., 616 F.3d at 231.

It was reasonable for the New York State Legislature and the Commission to have been concerned that a public campaign finance system may modify behavior, making running for office more attractive, at some expense to the public campaign finance system. Munro, 479 U.S. at 195-96

Second, with respect to the Petition Requirement, the same valid interests—ensuring a sufficient modicum of public support, reducing voter confusion and ballot overcrowding, and protecting against the public financing of frivolous candidates—support the policy decisions made by the New York State Legislature. New York has demonstrated that the comparatively low signature requirement has resulted, since 1994, in no fewer than 5 and up to 10 candidates for governor in each gubernatorial election, many from quixotic, one-time nominating bodies without lasting support. Report, at 64-65.[13] For example, between 1998 and 2020, 15 independent bodies obtained a berthing for their gubernatorial candidates through nominating petitions, including the "Rent Is Too Damn High Party" and the "Stop Common Core Party." Brehm Decl. ¶ 69. Therefore, the Commission recommended the increased Petition Requirement as a "corollary" to the increased Party Qualification Requirement. Report, at 15. As with the Party Qualification Requirement, the increase in the level of required, demonstrated support was, in part, to account

---

("Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights"); see also SAM Party, 987 F.3d at 277 (noting that "even if the State has installed other measures aimed at preventing nonviable candidacies from receiving public funds, it may pursue multiple avenues towards that goal").

[13] For example, in the 2014 Gubernatorial Election, which featured 5 candidates cross-nominated across 10 ballot lines, the Sapient Party's nominee obtained only 4,963 votes, representing less than 0.13 percent of the total votes cast. Brehm Decl. Ex. A.

for a significant increase in the number of eligible voters. Brehm Decl. ¶¶ 66-67. The plaintiffs have failed to demonstrate that New York's decision to raise the number of required signatures was discriminatory, or failed to further a sufficiently weighty legitimate interest. As with the Party Qualification Requirement, the New York Legislature was permitted to act preemptively and was not required to "prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidates as a predicate to the imposition of reasonable ballot access restrictions" or "sustain some level of damage before the legislature [can] take corrective action." Munro, 479 U.S. at 195. Under the less searching scrutiny that non-severe ballot-access restrictions receive, New York's chosen Petition Requirement need not be the best way to avoid ballot overcrowding--it need only be a reasonable way to avoid ballot overcrowding. See De La Fuente v. State, 278 F. Supp. 3d 1146, 1156 (C.D. Cal. 2017), aff'd sub nom. De La Fuente v. Padilla, 930 F.3d 1101 (9th Cir. 2019). Raising the number of signatures required is a reasonable, direct, and narrowly-tailored method for assuring that a candidate enjoys sufficient public support before allowing such candidate to appear on the ballot.

The plaintiffs have failed to cite any persuasive legal authority to demonstrate that it is impermissible for New York

to set the necessary "modicum" of demonstrated support at 0.33 percent of the State's registered voters.

Although political parties must be given the opportunity to develop channels for seizing political opportunity, "[b]allots serve primarily to elect candidates, not as forums for political expression." Timmons, 520 U.S. at 363. The fact that the Libertarian Party and the Green Party may need to increase the number of volunteers they have previously used or hire additional paid canvassers does not establish that the burdens are outweighed by New York's regulatory interests. Cf. Munro, 479 U.S. at 198 ("States are not burdened with a constitutional imperative to reduce voter apathy or to handicap an unpopular candidate to increase the likelihood that the candidate will gain access to the general election ballot."). Both the Party Qualification Requirement and Petition Requirement ultimately enacted are not so burdensome that they outweigh New York's valid regulatory interests.

To the extent the plaintiffs seek to argue the Petition Requirement has become more burdensome or severe as result of COVID-19, that proposition is too speculative to provide the basis for a preliminary injunction. For the 2020 election, pursuant to Executive Order 202.46, the signature requirements for independent nominations were reduced for all offices. Brehm Decl. ¶ 72. The petition collection period for the 2022 election

would begin in May of 2022, and the plaintiffs' concerns about
COVID-19's potential implications for the 2022 signature
collection process are too conjectural or hypothetical to
provide the basis for relief.

Because the plaintiffs have failed to demonstrate the
likelihood of success on the merits of their claims that the New
York Election Law provisions at issue are unconstitutional as
applied to them, the plaintiffs have failed to make the much
higher showing required to demonstrate a likelihood of success
on the merits of their facial challenge. Washington State
Grange v. Washington State Republican Party, 552 U.S. 442, 449
(2008) (upholding an election law restriction and noting "a
plaintiff can only succeed in a facial challenge by
"establishing that no set of circumstances exists under which
the Act would be valid, i.e., that the law is unconstitutional
in all of its applications").

**B.**

The plaintiffs argue that their interests would be irreparably harmed without an injunction, because the Libertarian Party and the Green Party will continue to remain "independent bodies" without the practical benefits of recognized party status, and because the petition requirements pose significant burdens for them for the 2022 elections.

But, as the Court of Appeals noted in SAM Party, "[t]he presence of irreparable injury to First Amendment rights, however, turns on whether the plaintiff has shown a clear likelihood of success on the merits." SAM Party, 987 F.3d at 278. Because the plaintiffs have failed to demonstrate a likelihood of success on the merits, they have similarly failed to demonstrate they would be irreparably harmed without a preliminary injunction.

**C.**

When considering whether the preliminary injunction is warranted, federal courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." Yang v. Kosinski, 960 F.3d 119, 135–36 (2d Cir. 2020) (quoting Winter, 555 U.S. at 24). While the challenged provisions may result in practical difficulties for both sets of

plaintiffs, and "while some voters would surely like to see the [the Libertarian Party and Green Party] automatically included on their ballot in the next cycle, the interest of those voters does not outweigh the broader public interest in administrable elections, ensuring that parties enjoy a modicum of electoral support, and the conservation of taxpayer dollars." SAM Party, 987 F.3d at 278. Further, the plaintiffs have failed to explain why the Libertarian Party and the Green Party deserve to be treated differently from the SAM Party and Independence Party—both formerly recognized parties that failed to satisfy the Party Qualification Requirement, and thus were decertified. Based on these considerations, the balance of equities and the public interest do not favor a preliminary injunction.

CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. The plaintiffs' motion for preliminary injunction is **denied**. The Clerk is directed to close docket numbers 46, 50, and 62.

**SO ORDERED.**

Dated:    **New York, New York**
          **May 13, 2021**

                                          **John G. Koeltl**
                                  **United States District Judge**